# Exhibit A

WAYNE PARSONS,  ESQ #1685
1406 Colburn Street, Suite 201C
Honolulu, Hawai`i 96817
T: (808) 845-2211
F: (808) 843-0100
E-mail: wparsons@alohano.com

SERGIO RUFO, ESQ. #8211
Rufo Law Group, LLLC
1050 Bishop Street, # 322
Honolulu, Hawai`i  96813
T:  (808) 852-7836
E-mail:  sergio@RufoLawGroup.com

ALEJANDRO ALVAREZ, ESQ #11464
The Alvarez Law Firm
3251 Ponce de Leon Blvd.
Coral Gables, FL  33134
T: (305) 444-7675
F: (305) 444-0075
E-mail: alex@talf.law

**Electronically Filed
THIRD CIRCUIT
3CCV-22-0000072
15-MAR-2022
04:12 PM
Dkt. 1 CMPS**

Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| MARVIN MANIOUS, and his spouse, VALERIE MANIOUS,<br><br>Plaintiffs,<br><br>vs.<br><br>R.J. REYNOLDS TOBACCO COMPANY, a North Carolina for-profit corporation; PHILIP MORRIS USA, INC., a Virginia for-profit corporation; LIGGETT GROUP LLC, a Delaware for-profit limited liability corporation; SHOOK, HARDY & BACON L.L.P., a foreign limited liability partnership; COVINGTON & BURLING L.L.P., a foreign limited liability partnership; GREENSPOON MARDER L.L.P., a foreign limited liability partnership; WOMBLE BOND DICKINSON | Civil No. _____<br>Kona<br>(Product Liability)<br><br><br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS<br><br><br><br><br>Judge:<br><br>Trial:  No trial date assigned. |

(US) L.L.P., a foreign limited liability partnership; FOODLAND Super Market, Limited d/b/a FOODLAND, SACK 'N SAVE FOODS, and GAS N GO, a Hawai`i domestic corporation; J. HARA STORE, INC., Limited, a Hawai`i domestic corporation; and WAL-MART INC.,

Defendants.

# COMPLAINT

COMES NOW Plaintiffs, by and through their attorneys listed above, and for a COMPLAINT against Defendants PHILIP MORRIS USA INC., (PHILIP MORRIS); RJ REYNOLDS TOBACCO COMPANY, (REYNOLDS); LIGGETT GROUP LLC (LIGGETT); SHOOK, HARDY & BACON L.L.P. (SHOOK); COVINGTON & BURLING L.L.P. (COVINGTON); GREENSPOON MARDER L.L.P. (GREENSPOON); WOMBLE BOND DICKINSON L.L.P. (WOMBLE); FOODLAND Super Market, Limited, d/b/a FOODLAND, SACK 'N SAVE FOODS, and GAS N GO (FOODLAND); J. HARA STORE, INC. Limited, a Hawai`i domestic corporation (J. HARA); and WALMART INC., d/b/a WALMART (WALMART), and allege and aver as follows:

**PLAINTIFFS MARVIN AND VALERIE MANIOUS**

1. Plaintiffs bring the following claims against the following Defendants:

   a) REYNOLDS Counts 1, 2, 3, 4, 6, 7, 10, and 11

   b) PHILIP MORRIS, Counts 4, 7, and 11

   c) LIGGETT, Counts 4, 7, and 11

   d) SHOOK, Counts 5, 8, and 11

   e) COVINGTON, Counts 5, 8, and 11

   f) GREENSPOON, Counts 5, 8, and 11

   g) WOMBLE, Counts 5, 8, and 11

   h) FOODLAND, Counts 9 and 11

- 2 –

      i)      J. HARA, Counts 9 and 11

      j)      WALMART, Counts 9 and 11

2.      Plaintiffs MARVIN and VALERIE MANIOUS are and were legally married and at all times relevant herein residents in the County of Hawai`i in the State of Hawai`i.

3.      Plaintiff MARVIN MANIOUS was diagnosed on or about September 18, 2020, in the state of Hawai`i with laryngeal cancer, a smoking related disease, caused by smoking KOOL brand cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by Defendant REYNOLDS.

4.      Plaintiff MARVIN MANIOUS began smoking cigarettes as a teenager in approximately 1978 and smoked KOOL cigarettes from approximately 1978 to 2015 for sufficient time and quantities to cause his laryngeal cancer.

5.      Plaintiff MARVIN MANIOUS was exposed to the advertising and marketing of Defendants REYNOLDS, PHILIP MORRIS, and LIGGETT.  Plaintiff relied on the representations and warranties to his detriment from REYNOLDS, PHILIP MORRIS, and LIGGETT, about the health effects and addictive nature of smoking cigarettes made therein in making his decision to, begin, continue and purchase and smoke Defendant REYNOLDS' cigarettes.

6.      Defendants, REYNOLDS, PHILIP MORRIS, and LIGGETT made false and misleading statements directly and indirectly about the harms and addictive nature of the cigarettes they manufactured and smoked by the Plaintiff MARVIN MANIOUS, including but not limited to, statements that filter, lights and low tar cigarettes were safe or safer, that there was no causal link between smoking and diseases, and that smoking was not addictive.  Plaintiff MARVIN MANIOUS relied to his detriment as a result those false and misleading statements.

7.      All times relevant Plaintiff purchased the cigarettes referenced above from retail outlets operated by Defendants, FOODLAND, J. HARA, and WALMART, as more fully described in the foregoing paragraphs.

**DEFENDANTS**

8.      Defendant, R.J. REYNOLDS TOBACCO COMPANY, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina and conducting business throughout the United States, including in the County of Hawai`i and throughout the State of Hawai`i and did so during all times relevant to this action. At all times relevant Defendant, R.J. REYNOLDS TOBACCO COMPANY, registered to do business in the state of Hawai`i, as a foreign profit corporation, file # 32482 F1, and designed Corporate Services, Inc. as it's registered agent.   At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the cigarette products, including the cigarettes listed above, which the Plaintiff smoked and inhaled which caused and/or substantially contributed to his smoking related diseases, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

9.      Defendant, PHILIP MORRIS USA, INC., is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia and conducting business throughout the United States, including in the County of Hawai`i and throughout the state of Hawai`i, and did so during all times relevant to this action.  At all times relevant Defendant, PHILIP MORRIS USA, INC., registered to do business in the state of Hawai`i, as a foreign profit corporation, file # 30576 F1, and designed Capital Corporate Services, Inc. as it's registered agent. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products.

10.      Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MEYERS TOBACCO COMPANY), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of North Carolina and conducting business

- 4 –

throughout the United States, including in Honolulu, Hawai`i and throughout the state of Hawai`i. At all times relevant Defendant, LIGGETT GROUP LLC, is registered to do business in the state of Hawai`i as a foreign limited liability corporation, file # 42878 C6, and designed The Corporation Company, Inc. as it's registered agent. Defendant, LIGGETT GROUP LLC engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products.

11.    At all times material to this action, REYNOLDS is the successor corporation to Lorillard Tobacco Company, American Tobacco Company, and Brown & Williamson Tobacco Corporation. Accordingly, R.J. Reynolds is legally responsible for the conduct of Lorillard Tobacco Company, American Tobacco Company, and Brown & Williamson Tobacco Corporation.

12.    Defendants, REYNOLDS, PHILIP MORRIS and LIGGETT their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

   a.  that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, throat cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

   b.  that the diseases and/or injuries listed above would be more likely experienced if users such as the Plaintiff did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

   c.  that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

   d.  that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

   e.  that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

- 5 –

f.  that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g.  that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Plaintiff;

h.  that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

i.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

13.  Defendant SHOOK is a foreign limited liability partnership engaged in providing services throughout the United States including Hawai`i. SHOOK provided services to Philip Morris, Reynolds, and Liggett, either directly or indirectly, in support of the distribution and sale of cigarettes in the state of Hawai`i, including cigarettes consumed by Marvin Manious.

14.  Defendant COVINGTON is a foreign limited liability partnership engaged in providing services throughout the United States and Hawai`i. COVINGTON has provided services to Philip Morris, Reynolds, and Liggett, either directly or indirectly, in support of the distribution and sale of cigarettes in the state of Hawai`i, including cigarettes consumed by Marvin Manious.

15.  Defendant WOMBLE is a foreign limited liability partnership engaged in providing services throughout the United States including Hawai`i. WOMBLE is the result of the merger of Bond Dickinson LLP, and Womble Carlyle Sandridge & Rice, LLP, which provided services to Philip Morris, Reynolds, and Liggett, either directly or indirectly, in support of the distribution and sale of cigarettes in the state of Hawai`i, including cigarettes consumed by Marvin Manious.

16.  Defendant GREENSPOON is a foreign limited liability partnership engaged in providing services throughout the United States including Hawai`i. GREENSPOON is the successor by merger to, and assumed the liabilities of, Jacob, Medinger & Finnegan LLP ("JMF"), which provided services to Philip Morris, Reynolds, and Liggett either directly or indirectly, in

support of the distribution and sale of cigarettes in the state of Hawai`i, including cigarettes consumed by Marvin Manious.

17. Defendant FOODLAND is a Hawai`i domestic corporation, with its principal place of business in Hawai`i. Defendant FOODLAND conducted regular and sustained business in the State of Hawai`i, including the sale of cigarettes by its retail outlets, affiliates and franchisees. FOODLAND was regularly engaged in the business of packaging, distributing, and/or selling, either directly or indirectly, through third parties or related entities, cigarettes for sale to, and use by, members of the general public, and as a part of its business said Defendant sold cigarettes purchased by, smoked by, ingested by and causing harm to Plaintiff as alleged herein.

18. Defendant J. HARA is a Hawai`i domestic corporation, with its principal place of business located in Hawai`i. J. HARA conducted regular and sustained business in the State of Hawai`i, including the sale of cigarettes by its retail outlets, affiliates and franchisees. J. HARA was regularly engaged in the business of packaging, distributing, and/or selling, either directly or indirectly, through third parties or related entities, cigarettes for sale to, and use by, members of the general public, and as a part of its business said Defendant sold cigarettes purchased by, smoked by, ingested by and causing harm to Plaintiffs as alleged herein.

19. Defendant, WALMART, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business in the State of Arkansas and conducting business throughout the United States, including in the County of Hawai`i and throughout the state of Hawai`i, and did so during all times relevant to this action. At all times relevant Defendant, WALMART, is registered to do business in the state of Hawai`i as a foreign profit corporation, file # 14589 F1, and designated The Corporation Company, Inc. as it's registered agent. Defendant, WALMART, was regularly engaged in the business of packaging, distributing, and/or selling, either directly or indirectly, through third parties or related entities, cigarettes for sale to, and use by, members of the general public, and as a part of its business said Defendant sold cigarettes purchased by, smoked by, ingested by and causing harm to Plaintiff as alleged herein.

- 7 –

**JURISDICTION AND VENUE**

20.    The Court has jurisdiction over this matter pursuant to Hawai`i Revised Statutes ("HRS") § 603-21.5.

21.    Venue is proper under HRS § 603-36 because Defendants, reside, conduct business in, and/or are domiciled in the County of Hawai`i, and the State of Hawai`i.

22.    This Court has jurisdiction over this matter and venue is proper.  This Court has subject matter jurisdiction over this matter.  This is a claim by a resident of the state of Hawai`i, against Defendants who are both foreign corporations doing business in this state and domestic corporations incorporated in Hawai`i with their principal place of business in Hawai`i.  The tortious conduct giving rise to Plaintiff's injuries and the claims asserted herein occurred both inside and outside of Hawai`i, with the injuries and sustained by the Plaintiff in Hawai`i, while a Hawai`i resident.

23.    Plaintiff would further show that Defendants at all times material to this cause  of action, through their agents, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing the Plaintiff to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke, and the resulting harm, of contracting the diseases of lung cancer, laryngeal cancer, throat cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which they were exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Hawai`i during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Hawai`i, resulting in injuries to Plaintiff.  Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Hawai`i law.

24.     All Defendants conducted, and continue to conduct, business in the state of Hawai`i; made contracts to be performed in whole or in part in Hawai`i; and/or manufactured, tested, sold, offered for sale, gave away, advertised and supplied cigarettes, or placed defective cigarettes in the stream of commerce, or in the course of business, materially participated with others in so doing; and performed such acts as were intended to, and did, result in the sale and distribution in Hawai`i of defective cigarettes from which Defendants derived substantial revenue, directly or indirectly.

25.     All Defendants knew their acts would and did cause tortious injury by acts or omissions in the state of Hawai`i, and/or caused tortious injury in Hawai`i by acts or omissions outside of Hawai`i.

26.     This Court has subject matter jurisdiction over this matter. This is a claim by a resident of the state of Hawai`i against Defendants who are both foreign corporations doing business in this state and domestic corporations incorporated in Hawai`i with their principal place of business in Hawai`i. The tortious conduct giving rise to the Plaintiff's injuries, and the claims asserted herein occurred both inside and outside of Hawai`i, with the injuries sustained by the Plaintiff in Hawai`i, while a Hawai`i resident.

**Historical Allegations of the Cigarette Manufacturer's
Unlawful Conduct Giving Rise to the Lawsuit**

27.     Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States.  By 1935, there were an estimated 4,000 lung cancer deaths annually; and, by 1945, that figure had almost tripled.

28.     By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

- 9 –

29.     By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

30.     The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

31.     In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

32.     In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Willliamson Tobacco Co., (B&W); O. Parker McComas, President of Defendant Philip Morris; Joseph F. Cullman, Jr., President of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co..

- 10 –

33.     Executives from every tobacco company listed above, with the exception of Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (I) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

34.     The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b) to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the minutes of the meeting reveal that:

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

35.     At the December 14, 1953 meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course

recommended by the Public Relations Counsel) as long as the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

36.     At the December 15, 1953 meeting, the participants were Paul Hahn of American, O.Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action."  According to a Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry as a result of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

37.     In an internal planning memorandum, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And, most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

38.     Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health

effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

39.     In fact, one of the questions posed by Hill & Knowlton to Defendants was "whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

40.     Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

41.     Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

- 13 –

42.     Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

43.     The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O. Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

44.     The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

The "Frank Statement" in its entirety stated as follows:

"RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.
Although conducted by doctors of professional standing, these experiments

- 14 –

are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out:  1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is.  3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer:1.  We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

45.     The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

- 15 –

46.      The Frank Statement was but the first of hundreds, if not thousands, of statements reassuring the public of the safety of cigarette smoking.  The industry would push the "open question" as far as the late 1990s.

47.      Shortly after the Frank Statement was published, Philip Morris, through a publicized speech, told the public that the industry would "stop business tomorrow" if it thought its products was harming smokers.

48.      TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

49.      In 1962, The Tobacco Institute, the public relations successor to the TIRC began to publish many advertisements, including one entitled, "Some frank words about Smoking and Research," which stated in part:

> "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come only through persistent scientific research.
> "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public.
> "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study.
> "*We know we have a special responsibility to help scientists determine the facts about tobacco use and health.*
> "*The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee* to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and

intensified scale."

50.     Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

51.     A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

52.     Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed the majority of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

53. During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

54. Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

55. In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

56. In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that basic research kept alive Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

57. Following the 1964 Surgeon General's report, which discussed the connection between smoking and lung cancer, the industry publicly called for "more research" for the purpose

- 18 –

of suggesting that the health question about cigarette smoking was not yet clear, despite the industry's own internal decision not to conduct research directly related to tobacco and health.

58.    Despite Defendants' *public* response, internally they were fully aware of the magnitude and depth of lies and deception they were promulgating.  They knew and understood they were making fake, misleading promises that would never come to fruition.  Their own internal records reveal that they knew, even back in 1964, that cigarettes were not only hazardous, but deadly:

"Cigarettes have certain unattractive side effects . . . they cause lung cancer" (Concealed Document 1963).

"Carcinogens are found in practically every class of compounds in smoke" (Concealed Document 1961).

"The amount of evidence accumulated to indict cigarette smoke as a health hazard is overwhelming.  The evidence challenging such indictment is scant" (Concealed Document 1962).

59.    Furthermore, not only did Defendants know and appreciate the dangers of cigarettes, but they were also intentionally manipulating ingredients, such as nicotine, in cigarettes to make them more addictive.  Their documents reveal they knew the following:

"Our industry is based upon design, manufacture and sale of attractive dosage forms of nicotine" (Concealed Document 1972).

"We can regulate, fairly precisely, the nicotine . . . to almost any desired level management might require" (Concealed Document 1963).

 "Cigarette[s] that do not deliver nicotine cannot satisfy the habituated smoker and would almost certainly fail" (Concealed Document 1966).

 "Nicotine is addictive . . . We are then, in the business of selling nicotine, an addictive drug" (Concealed Document 1963).

"We have deliberately played down the role of nicotine" (Concealed Document 1972).

"Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison" (Concealed Document 1978).

"Determine minimum nicotine required to keep normal smoker 'hooked.'" (Concealed Document 1965).

"The thing we sell most is nicotine" (Concealed Document 1980).

"Without the nicotine, the cigarette market would collapse, and Defendants would all lose their jobs and their consulting fees" (Concealed Document 1977).

60.    In 1966 the Tobacco Institute ("TI") issued a press release where it stated on behalf of the industry:

"Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. *The tobacco industry is supporting much of this research and will continue to do so*."

61.    Defendants continued throughout the 1970s, 1980s, and 1990s to encourage the impression that there was a genuine and continuing controversy regarding the health hazards of smoking.

62.    The tobacco industry frequently attacked the Surgeon General. For example, the industry preempted the Surgeon General's 1979 report on national news networks, stating the report was "suspect from the start".  The industry later attacked the Surgeon General following the 1988 report on the addictive nature of cigarettes with a press release titled, "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE".

63.    Later in 1994, after the industry executives testified before congress that cigarettes were not addictive and had not been proven to cause cancer, Philip Morris continued to adhere to the controversy by stating "Both smokers and non-smokers deserve to know the facts, not innuendo, about cigarettes.

Yesterday, Philip Morris and other U.S. tobacco manufacturers helped to set the record straight by speaking before a Congressional committee…

Fact: Philip Morris does not add nicotine to its cigarettes…

Fact: Philip Morris does not "manipulate" nicotine levels…

Fact: Philip Morris does not believe cigarette smoking is addictive…

Fact: None of the ingredients added in the manufacture of cigarettes is harmful as

- 20 –

used…

64.     From 1953 through 2000, Defendants made false or misleading statements including but not limited to the following:

- denying that smoking "is" addictive;
- that smoking is not injurious to health;
- that it is unknown if smoking causes serious diseases;
- that scientific and medical community has not reached a consensus about the harms of smoking;
- that no one knows what causes cancer;
- that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not need proven;

65.     From 1953 through the present, Defendants made false or misleading statements including but not limited to, that filter, low tar and low nicotine, lights and ultra-light are safe, or safer than full flavor cigarettes, and/or directly and/or indirectly made statements about their safety and efficacy.

66.     Throughout the same period, Defendants publicly attacked the validity of research suggesting any harmful effects from smoking.

67.     The purpose of this campaign was to create an impression in the public's mind—including smokers like Plaintiff—that the health issue remained undecided and smoking was not addictive or injurious to health.

### Conspiratorial Involvement by General Counsel for Tobacco Companies & Outside Law Firms

68.     Throughout the conspiracy, Philip Morris, Reynolds, Liggett, and their co-conspirators utilized attorneys – both in-house and outside counsel – to further their conspiracy to conceal and misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter", "light", and "low tar" cigarettes, and the addictive qualities of nicotine. Philip Morris, Reynolds, Liggett, and their co-conspirators engaged in a fraud directed nationally and at the State of Hawai`i with these attorneys both before any litigation was contemplated, and once litigation against the tobacco companies began.

69.     Philip Morris, USA Inc., RJ Reynolds Tobacco Company, Liggett Group LLC, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, collectively and through their general counsel offices, formed an association known by differing names over time as the Committee of Counsel and/or the Counsel of Six ("CC"), whose purpose was to oversee, organize, operate, and execute a conspiracy to conceal and misrepresent the harms and addictive nature of cigarettes.

70.     Beginning in the 1950s Philip Morris, USA Inc., RJ Reynolds Tobacco Company, Liggett Group LLC, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, through the CC, retained outside counsel to assist them in their conspiratorial activities which included to conceal and misrepresent the harms of smoking and its addictive nature to the public.

71.     Philip Morris, Reynolds, Liggett, and their co-conspirators retained as outside counsel several law firms, including, SHOOK, COVINGTON, JMF, WOMBLE, and others.

72.     Beginning in the 1950s, and continuing during the relevant time periods, the CC and the outside law firms (hereafter "Lawyers") conspired with Philip Morris, Reynolds, Liggett, and their other co-conspirators and acted as agents, servants, representatives and/or employees of Philip Morris, Reynolds, Liggett, and their co-conspirators in furtherance of the conspiracy.

73.     The Lawyers played a central role in the creation and perpetuation of the conspiracy and the implementation of its fraudulent schemes throughout the United States as well as in Hawai`i, including but not limited to the following:

(a)     The Lawyers oversaw domestic smoking and health projects;

(b)     The Lawyers directed "scientists" as to what research they should and should not undertake;

(c)     The Lawyers were involved at every level of alleged scientific "research" pursued by Defendants and the tobacco industry;

(d)     The Lawyers devised and carried out document destruction policies and took shelter behind baseless assertions of attorney client privilege;

- 22 –

(e)     The Lawyers also worked with and coached scientists on how to be possible witness in litigation, how to speak at legislative hearings, how to serve as consultants, and how to conduct specific supposed research;

(f)     The Lawyers screened international scientists in order to eliminate those with views opposing the conspiracy;

(g)     The Lawyers directed and oversaw the false and misleading public positions and statements made by the Defendants and those through the TIRC/CTR and TI;

(h)     The Lawyers directed and oversaw false and or misleading submissions to public health authorities and governmental entities regarding the harms of smoke in cigarettes;

(i)     The Lawyers cleared cigarettes advertisements for the Defendants to ensure the continuation of the conspiracy;

(j)     The Lawyers directed a massive denial campaign to create false expectations about the safety of cigarettes smoke in general including smoking cigarettes and secondhand smoke;

(k)     The Lawyers provided false and misleading testimony and submissions to governmental agencies regarding the safety of cigarettes smoke in general including smoking cigarettes and secondhand smoke;

(l)     The Lawyers engaged and assisted the Defendants t, in conduct that the Lawyer knew were  fraudulent;

(m)     The Lawyers engaged and assisted the Defendants in conduct that the Lawyers knew was fraudulent;

(n)     The Lawyers hid the source of the money used for special projects to make them appear more acceptable to the public; and

(o)     The Lawyers ensured that Philip Morris, Reynolds, and the tobacco industry did not directly support legitimate projects related to smoking and health, and instead directed the companies toward supporting alternative projects including junk

- 23 –

science, attacks on legitimate public health research, and research of scientifically implausible alternative causation theories for smoking-related diseases.

74.    Defendants improperly sought to and did conceal material research behind the attorney-client privilege and the work product doctrine in order to avoid discovery. To accomplish that purpose, Defendants' lawyers exercised extensive control over joint industry and individual company scientific research and often vetted scientific documents for Defendants. For example, correspondence with an institute or an individual regarding CTR special projects was not turned over to CTR, but was instead kept at the law firm generating the letters. Don Hoel (SHOOK) believed that such correspondence was never even provided to CTR nor produced in any litigation.

75.    Many of the actions to suppress information were joint efforts by all of the tobacco companies through the CC, through other joint organizations, or through the companies' law firms, which often represented one or more of the companies.

76.    The Lawyers devised and coordinated both national and international strategy; they directed scientists as to what research they should and should not undertake; they vetted scientific research papers and reports as well as public relations materials to ensure that the interests of the conspiracy would be protected; they identified "friendly" scientific witnesses, subsidized them with grants from the Center for Tobacco Research and the Center for Indoor Air Research, paid their fees, and often hid the relationship between those witnesses and the industry; and they devised and carried out document destruction policies and took shelter behind assertions of the attorney client privilege.

77.    The Lawyers were also crucial to the development of mis-direction research that Philip Morris, Reynolds, Liggett, and the tobacco industry funded through their selection of Directors for the Center for Tobacco Research (CTR) Scientific Advisory Board (SAB) who imposed unnecessary limits on the research funded by CTR.

78.    Additionally, the outside Lawyers went so far as to take over access to a database of documents created by Reynolds' Research and Development division. The outside Lawyers

banned the tobacco companies and their in-house counsel from accessing these documents in order to conceal the documents through a false assertion of alleged attorney work-product privilege.

79.    Further, the Lawyers played a major role in Philip Morris, Reynolds and their co-conspirators' witness development plans to perpetuate the conspiracy's "open question" position.

80.    Lawyers directed committees specifically created to further the conspiracy. For example, on November 17, 1978, a report on a CTR Meeting in New York stated that William "Bill" Shinn (SHOOK) said that the ad hoc committee should be a broad policy making committee, not just a smoking and health committee, and that the best way money was spent was on "special projects" where "CTR has acted as a 'front'.

81.    Lawyers called and chaired meetings with co-conspirators. For example, on July 15, 1988, a meeting of industry scientists and lawyers was held to analyze national and international activities on Environmental Tobacco Smoke in London, England. Don Hoel (SHOOK) chaired the meeting.

82.    Members of the outside law firms presented the results of scientific studies at similar meetings. For example, on May 18, 1993, Chris Proctor a senior scientific advisor with COVINGTON, presented four epidemiologic studies. These studies were used to "merchandize the 'positive' progress in epidemiology", for COVINGTON to convey the message into the scientific community.

83.    Smoking and health projects were overseen by lawyers domestically. For example, a June 28, 1988, memorandum written by Donald Hoel (SHOOK) stated that SHOOK assessed scientists' potential to assist the tobacco industry. If the assessment was positive, SHOOK recommended the scientist for funding from the industry. During a project, SHOOK closely monitored the project and reviewed any papers resulting from the research.  SHOOK advised Philip Morris on whether to initially fund, and whether to continue or discontinue funding, the scientists. SHOOK worked to develop the scientists as possible witnesses in litigation, to speak at legislative hearings, to serve as consultants, and to conduct specific research. SHOOK arranged funding, settled logistical problems, and served as an intermediary for the tobacco industry.

84.    International smoking and health projects were also overseen by Lawyers. For instance, on July 24, 1991, a report written by Sharon Boyse of British American Tobacco (BAT) said Latin American and Far East programs were ideal because COVINGTON developed them in such a way "that there was no direct association between the scientists and the tobacco industry."

85.    On April 6, 1987, an interoffice memorandum detailing the discussion at an international meeting held on March 18-19, 1987, featuring industry representatives, lawyers, and scientists from the US, UK, West Germany, and Japan addressed the issue of industry sponsored research on Environmental Tobacco Smoke (ETS). Lawyers at the meeting stressed the need for close cooperation between scientists and public relations professionals.  Attendees were told that "[c]oncerted action is needed to improve the Industry's position".

86.    Lawyers were crucial to the continued success of the conspiracy because they continually monitored for potential legal liability. Sometime after April 28, 1995, a document titled "Brown & Williamson Documents: Document by Document Summary of Publicly Available Information from the Press" was created. Under a section titled "David. R. Hardy Letter", Hardy stated "documentary evidence from the files of either BAT or B&W which seems to acknowledge or tacitly admit that cigarettes cause cancer or disease would likely be fatal to the defense. . . in a smoking and health case".

87.    Lawyers altered information to make it appear legitimate.

88.    In furtherance of the conspiracy, Lawyers hid the source of the money used for special projects to make them appear more acceptable to the public.

89.    On July 13, 1984 a memorandum from Lee Stanford to David Hardy of SHOOK stated, "Non-CTR projects fund was originally developed so that companies would not be paying scientists directly".

90.    On October 31, 1988, a memorandum from Christopher "C.J." Proctor (COVINGTON), in regard to a meeting to inform the UK industry about Philip Morris's initiative to establish a group of scientists in the UK to comment on ETS issues, Proctor wrote, "it was

suggested that the position of Covington and Burling allows the members of each group to remain independent of the industry though all know that it is tobacco money that is funding the exercises."

91.    In October 1989, a scientist from BAT, Dr. Ray Thornton, was invited by Dr. Helmut Gaisch, of Philip Morris, to a meeting with the Association for Research on Indoor Air (ARIA). Dr. Thornton's record indicates Philip Morris funded ARIA, through COVINGTON, who in turn supplied money to George Leslie, who in turn set up ARIA.

92.    On April 28, 1992, David Murphy an attorney for Wachtell, Lipton, Rosek & Katz (another law firm working for Philip Morris), wrote that Lorillard and CTR inquired about funding through a SHOOK special account for a Dr. Bennett Jenson. SHOOK proposed to give Dr. Jensen $40,000, not for specific research or with an eye to publication but solely to maintain a good relationship with him and secure his continued help in contacting other scientists. Dr. Jensen previously received CTR Special Project Funds in 1988. Murphy wrote:

> Allinder admits that Shook Hardy wants to give Jensen money to keep him happy and that there is no immediate value to his research . . . issue raises a larger question—whether 'CTR Special Projects' funds (and, after such activities were moved out of CTR, joint industry funds administered through Shook, Hardy) were used to purchase favorable judicial or legislative testimony, thereby perpetrating a fraud on the public."

93.    Lawyers used work product privileges to conceal the conspiracy. On June 25, 1996, Mark Berlind, general counsel for Philip Morris, sent an email stating he participated in a conference call with Reynolds, where it was decided that it would be appropriate for the lawyers of both companies not to have a role in the ongoing discussions about a Dr. Enstrom's proposals, presumably so a neutral outside counsel member could pursue the proposals. In the email, Mr. Berlind wrote, "one of his proposals is clearly litigation oriented and, we agreed, should still be pursued, if at all, in context of attorney work product."

**Lawyers altered or hid the development of research**

94.    Outside counsel were involved at every level of scientific research pursued by the tobacco industry in order to ensure the continued success of the conspiracy.

- 27 –

95.     Outside counsel's involvement insured that the tobacco industry did not support projects related to smoking and health.

96.     In 1958 BAT representatives wrote a report on their visit to the US and Canada. A section of the report titled "Attitude of U.S. industry to Biological Testing" stated:

> the constantly re-iterated "not proven" statements in the face of mounting contrary evidence has thoroughly discredited T.I.R.C., and the S.A.B. of T.I.R.C. is supporting almost without exception projects which are not related directly to smoking and lung cancer.

97.     Instead of supporting projects directed to finding out the truth about smoking and health, lawyers directed the projects in order to bolster defending the industry, thereby, perpetuating the conspiracy.

98.     On January 18, 1954 at a Tobacco Industry Research Committee (T.I.R.C) meeting, it was decided that a list of available scientists who were willing to talk in public needed to be created, and that the list would be used only to defend the industry's position. The report stated:

> this list would not be used to promote new discussion programs or to encourage forums to arrange such programs. The objective would be to see that if there is to be a program, the facts to be presented are not one-sided against the industry.

99.     Outside counsel promoted the development of research they knew had little to no value so long as it did not result in findings adverse to the conspiracy.

100.    On July 24, 1981, J.K Wells, General Counsel B&W, sent Ernest Pepples a letter in regard to a request made by outside counsel, Tim Finnegan (JMF). Finnegan visited Dean Sullivan and persuaded him to "take a new thrust with their research . . . the new research will have questionable value, but no negative results,".

101.    Outside counsel was also crucial to the development of the research the industry funded because they selected Directors for the Center for Tobacco Research (CTR) Scientific Advisory Board (SAB) that imposed limits on research funded by CTR.

102.   On February 14, 1980, William Shinn, of SHOOK, wrote a letter to Ernest Pepples, regarding candidates for replacement of the CTR SAB Director. Shinn provided Pepples with a list of candidates, and stated, what sort of person do we want as a scientific director? This is a key question and perhaps you and I can discuss it next time we are together.

103.   On June 10, 1980, William Shinn, met with Ernest Pepples, Addison Yeaman, Tom Hoyt, and Bill Hobbs to discuss candidates for replacement of the CTR SAB Director.

104.   In 1981, Dr. Sheldon "Charlie" Sommers was selected for the position and later that year outlined new CTR operating procedures that made it impossible to receive CTR funding if a study involved a commercial cigarette brand, or the development of a therapeutic procedure.

105.   In 1985, a Jones Day (DAY) Report monitoring Reynolds's Monitoring Smoking and Health Literature found that after the 1964 Surgeon General's report came out, the lawyers used their influence to forestall research that would appear to acknowledge that cigarettes or cigarette smoke contained harmful constituents or posed a health problem.

106.   For example, in a summary report of a special meeting of the UK industry on Environmental Tobacco Smoke, held in London, on February 17, 1988, Philip Morris presented their global strategy on environmental tobacco smoke. The report stated:

> Although the industry is in great need of concerted effort and action in the ETS area, the detailed strategy of Philip Morris leaves something to be desired. The excessive involvement of external lawyers at this very basic scientific level is questionable and, in Europe at least, is likely to frighten off a number of scientists who might otherwise be prepared to talk to the industry.

107.   Outside lawyers directed scientists on the research the industry performed.

108.    On July 15, 1988, a meeting of industry scientists and lawyers was held to analyze national and international activities on Environmental Tobacco Smoke in London . John Rupp, an attorney with COVINGTON, argued with Dr. Adlkofer, the head scientist of Verband (the German Tobacco Institute), over the usefulness of continuing current epidemiologic studies. Dr. Adlkofer argued focusing on "modern epidemiology", human exposure studies, and exploration of the mechanisms of effect. Rupp said, "epidemiological evidence is necessary if for no other reason

than to effectively respond to anti-smoking groups . . . the industry should continue to emphasize the lack of substantive proof of causation".

109.    On March 8, 1983, Timothy Finnegan (JMF), met with Dr. George Robert DiMarco, the head of Research & Development for Reynolds, in Winston-Salem, North Carolina. Dr. Dimarco stated "researchers had been turned off because they were told they could not do certain things by lawyers".

110.    In a letter dated April, 28, 1978, Donald Hoel, of SHOOK, told Paul Isenring, of Philip Morris Europe, it was not appropriate to accept a consultant, Dr. Ernst Heynig's, recommendation because the industry did not want to be in the position of recommending a testing procedure but would prefer to be free to comment on or criticize any such testing procedure as might be established or recommended.

111.    Lawyers screened international scientists in order to eliminate those with views opposing the industry.

112.    On October 2, 1992, Patrick Davies sent a letter to a Brazilian scientist answering his questions in regard to the search for a Brazilian epidemiologist. "North American Consultants" had given Davies some leads, and he would provide a list of names within the next few days. Davies wrote, "Chris [(Proctor of COVINGTON)] will be returning to Brazil to oversee the field study, our goal is to identify candidates before then so Chris can interview them while he is there."

113.    On February 20, 1988 David Remes (COVINGTON), wrote a project report on Philip Morris's international efforts in opposition to ETS, the report stated:

> C&B has undertaken to identify and organize the corps of scientific consultants and engineers in all of the markets around the world . . . **Candidates who have made public statements adverse to the industry on the primary health issue generally are avoided**. . . C&B has asked Drs. Roe and Leslie to arrange a meeting between C&B and as many interested candidates as possible at the earliest opportunity to explain the nature of the ETS project and the role of the candidates in detail. (Emphasis added).

114.    On September 27, 1989, John Rupp (COVINGTON), wrote a status report on the "Asia ETS Project". The report discussed an ETS Symposium at McGill University to be held on

November 3rd and 4th. The purpose of the symposium was to produce an authoritative monograph that would serve to neutralize two reports that were scheduled to be released near the end of the year. Additionally, the symposium presented an ideal opportunity to develop the Asian consultants on the full range of issues and the industry's most advanced current thinking on ETS.

115.    On June 24, 1987, Conference Notes from Project Down Under report stated:

John Rupp (Covington & Burling) Where are we? In deep shit . . . Serious Credibility problem . . . Our position: ETS not shown to be health hazard to non-smoker . . . We cannot say ETS is "safe" and if we do, this is a "dangerous" statement . . . Somebody has to say ETS is no risk. Has to come from somewhere.

116.    On March 17, 1977, Donald Hoel, of SHOOK, sent a letter to industry representatives briefing them on a CTR supported Special Project that was funded in April 1975. Hoel was disappointed by the study's treatment of smoking and lung cancer because the authors stated that the data "speak strongly against the constitutional hypothesis" pushed by the industry, i.e., that it was a person's genetic makeup that led to disease rather than cigarettes. Additionally, the study claimed that the twin data supported the "irrefutable evidence of a causal association between smoking and lung cancer found in other studies".

117.    Research that was engineered by outside attorneys was used to attack the scientific evidence that showed smoking was harmful.

118.    In August 1990, SHOOK prepared "Brown & Williamson--Addiction Notebook", the notebook reviewed scientific literature and B&W documents relating to addiction. The notebook outlined B&W's strategy concerning company admissions that smoking is addictive is to focus "on the weakness of the scientific evidence that smoking meets the traditional addiction criteria".

119.    Outside counsel also developed several researchers in furtherance of the conspiracy.

120.    For example, Dr. Gary Huber was a Harvard researcher the industry continued to fund because they believed if they stopped it would turn him into a dangerous enemy.

121. On December 13, 1974, Dr. Huber's initial study commenced at Harvard University to analyze smoke components.

122. On February 5, 1975, David Hardy of SHOOK wrote a letter confirming that Dr. Huber did not have to make written annual reports because Hardy was concerned Dr. Huber might say something exposing legal liability. Hardy stated, "the scientist who has no legal training and who does not fully understand some of our problems and concerns, exercises little care in his form of expression in written communication,".

123. On March 7, 1975 Dr. Huber began animal studies using 800 animals. The goal was to move to a larger lengthier study using 2,000 animals.

124. On September 26, 1977, Dr. Huber reported in confidence to William Shinn that rats exposed to tobacco smoke for six months developed emphysema. Shinn attempted to get Huber to lessen his interpretation of the results as evidence of direct cause and effect.

125. On October 26, 1977, Shinn announced to the industry that Dr. Huber would not discuss work with the press, and would only answer questions following his presentation from the floor. The next day, Dr. Huber shut down the research facility. As a result, Harvard was not able to conduct long term studies and proceeded with industry recommendations for short term studies.

126. On November 8, 1977, Shinn advised the industry about anticipated costs for renovating the facility. Shinn told the industry to anticipate a request for up to $400,000.

127. In December, at a T.I. meeting, Shinn reported Huber's lab was shut down entirely and as a result, that no work was being done. Shinn also reported that Huber was still putting together a budget for renovating the lab. There was general dismay with Huber's recent behavior, but they generally agreed that the industry was stuck with Huber and that "to cut him off would make a bitter and dangerous enemy".

128. In 1980, Huber sought to continue his smoking and health research on animals at a time when he was making significant progress, but Defendants cut off funding for his research at Harvard and denied his request for funding after he moved later that year to the University of Kentucky. In a 1980 meeting, Defendants' attorneys told Huber that the reason funding for his

research had been discontinued was because he was "getting too close to some things." The attorneys included Lee Stanford (SHOOK).

129.   When Huber was subpoenaed by the State of Texas to testify in its case against the industry in 1997, lawyers for Defendants, including Robert McDermott (DAY) and Lee Stanford (SHOOK) contacted him and urged him "to keep the faith, to hold the line."  The attorneys implied to Huber that he did not "fully appreciate the full weight of Shook, Hardy & Bacon and Jones Day" representatives of the tobacco industry. The calls caused Huber to fear for the safety and financial security of his family.  Huber believed Defendants Philip Morris and Reynolds wanted to keep him silent.

130.   Dr. Eleanor MacDonald was a statistician whose work would have been discontinued if outside lawyers from SHOOK had not intervened by recommending her denial be reconsidered. As a result of this, she was able to continue her work which provided publications and manuscripts later used to attack studies linking smoking to negative health effects.

131.   On March 15, 1971, Dr. MacDonald told CTR she had unpublished data showing Mexican women in El Paso had significantly more incidence of lung cancer than white women and cigarette smoking was not involved because Mexican women do not smoke in great amounts.

132.   In 1972, MacDonald sent a request to CTR for additional funds to complete work, and that request was denied. In response to this denial, SHOOK sent a letter to industry representatives vouching for the importance of Dr. MacDonald's work and recommending funding it to completion.

133.   As a result of SHOOK's recommendation, on November 30, 1972, CTR approved MacDonald's financial request.

134.   On December 7, 1973, MacDonald requested a supplemental extension for existing grant proposal.

135.   On February 9, 1976, Don Hoel (SHOOK) sent a letter to Arthur Stevens (VP and GC Lorillard) in reply to Stevens question, whether the absence of cigarette smoking data would limit the value of the other studies being performed by Macdonald. Hoel said Macdonald assured

- 33 –

him that she had anticipated and would meet any criticism stemming from the absence of cigarette smoking data when she published her results.

136.    On June 27, 1977, Dr. MacDonald sent a letter with her anticipated budget to complete a volume on environmental factors and causes of death pertaining to lung cancer. American Brands approved Special Project funds for MacDonald. Philip Morris further approved continued support to MacDonald.

137.    On February 14, 1979, MacDonald requested CTR Special Project support for an additional year. The past year saw her first book published, and her second book was, at the time, in press. Both represented culminations of her research that was funded by the industry. In preparation, was a third book giving her personal overview of 50 years of cancer epidemiology. CTR was also expected to consult with her on the upcoming 1979 Surgeon General's Report.

138.    On September 10, 1981, at a Meeting of Committee of General Counsel, attended by outside lawyers from JMF and SHOOK. MacDonald was named as an example of a person that does not make a good witness but is valuable because she was "someone who knows many people, has ideas, and is sympathetic,".

139.    Dr. Murray Senkus, a Research Director for Reynolds, was hired as an in-house scientist by outside law firms in order to help with the manipulation of studies.

140.    On May 9, 1980, William Shinn (SHOOK) suggested Dr Senkus be employed, as a consultant, through Special Fund 4 for SHOOK for one year. Senkus had an arrangement with other outside counsel, COVINGTON, and would split his time evenly between both firms.

141.    On April 2, 1981, Senkus and other scientists were charged with the responsibility of identifying an organization to conduct research on "particulates".

142.    On November 24, 1981, SHOOK recommended Senkus' consultancy be extended another year.

143.    On May 27, 1982, Dr. Senkus sent a letter outlining his trip visiting Battelle Labs for smoking experiments involving filters. Senkus advised Battelle to treat filters with potassium

- 34 –

bisulfate, and this altered the results of the test.  There were no significant amounts of nicotine detected in the treated filters.

144.    On September 2, 1982, Lorillard sent Patrick Sirridge, of SHOOK, a letter saying that if Battelle Labs did not perform at the expected level and meet objectives of a defined experiment, no further work would be contemplated at Battelle in regard to the project in question. Senkus sent a letter that indicated suggested changes for cleanup procedures to Battelle.

145.    On November 12, 1982, Patrick Sirridge sent a letter to the industry recommending Dr. Senkus be retained by SHOOK as a consultant on a per diem plus expenses basis.  The Battelle research was not expected to continue much longer than March 1983.

146.     Outside attorneys streamlined the approval process of funds for researchers for greater control of the research being funded by the industry.

147.    On March 1, 1972, William Shinn (SHOOK) recommended a grant of $5,000 as a special project for Dr. Theodor Sterling for a panel meeting on Effects of Pollutants on Human Health.

148.    On February 27, 1980, Shinn recommended Dr. Sterling's request to extend his project another year totaling funding approval at $283,130.

149.    On March 11, 1980 in a letter from Max Crohn Jr. (CTR Research Director) to CEO and President of Reynolds, Ed Horrigan Jr, Mr. Crohn wrote "Dr. Sterling is one of our industry's most valuable outside assets . . . Sterling has studied the effect which occupation has had confounding the reported statistical relationship between smoking and lung cancer".

150.    On September 10, 1981, Shinn decided to reduce administrative procedures for clearing Special Four (lawyer run) projects. Shinn asked for the presumption that the industry would fund each such project unless they opposed it in writing.

151.    On November 21, 1986, Robert Northrip of SHOOK teleconferenced with Dr. Sterling regarding clearance of one of Sterling's manuscripts before it was published.

152.    On January 15, 1987, Don Hoel (SHOOK) said he would invite Dr. Sterling to come to the next meeting to discuss the results of his study in Vancouver, B.C. involving office buildings before and after implementation of smoking restriction regulations.

153.    On March 2, 1990, Sterling's project was classified as no longer a CTR project, instead the project was to be funded directly by the companies and administered as a Special Research Project through SHOOK. Sterling would receive a check and divide the funds between Simon Fraser University and Sterling and Associates.

154.    On March 26, 1992, Dr. Sterling requested continued support for a research project for one year in the amount of $359,750. SHOOK recommended the research program for an additional two years. SHOOK said Sterling's challenges to the scientific bases of many of the results on smoking and health published in the epidemiological literature provided, "a much-needed perspective on the possible meanings of these scientific reports".

155.    Sterling was working on a publication suggesting that the estimation procedures, used for claims about the number of deaths yearly attributed to tobacco use, were neither reliable nor valid.

156.    On May 18, 1992, Philip Morris approved the project and sent SHOOK a check for $161,638.00 for Dr. Sterling's research.

157.    On October 27, 1982, a private individual, Dr. Armstead Hudnell contacted the CEO at Reynolds, Edward Horrigan, about meeting with Dr. DiMarco. Hudnell was surprised to learn there were no scientists on the Advisory Board of the Tobacco Research Council. Hudnell wanted T.I. to take out an option buying the right to use evidence he funded. Kornegay, Shinn, and Horrigan were aware of Hudnell, and his desire for the industry to accept the negative effects of smoking while focusing on potential benefits such as stress reduction.  They referred to Hudnell as "our old friend."

158.    On November 10, 1982, Hudnell sent a letter to North Carolina Senator Jesse Helms that stated he had shown his research to Dr. Hueber and Dr. Dimarco. In this letter, Hudnell stated SHOOK intended to perpetuate the smoking and health controversy to the detriment of both the

public and the tobacco industry, because without the controversy, its services would no longer be needed.  Two days later, DiMarco responded to Hudnell and acknowledged that he had met with Hudnell but disagreed with the assessment that DiMarco believed "cigarettes were guilty as charged".  Two days later, Hudnell sent a letter to Reynolds CEO, now J. Paul Sticht, stating SHOOK was the problem and that he was creating a new tobacco organization called Tobacco Review Unbiased On Tobacco & Health (T.R.U.T.H.).  A few days later, DiMarco wrote a letter to Hudnell insisting he cease unauthorized use of Reynolds's name in efforts to promote Hudnell's views.

159.    On December 9, 1982, Dr. Charles Nystrom, a Reynolds scientist, wrote to DiMarco with his comments on Hudnell's arguments. While he disagreed with Hudnell that cigarettes must show some important health benefit to be a defensible product, Nystrom said Hudnell made some interesting points such as that it is likely that a good portion of lung cancer in smokers is metastasized cancer from other sites.

160.    Also on December 13, 1982, Dr. DiMarco was sent for Law Department Orientation, with Edwin "Ed" Jacob (JMF). DiMarco believed that working on the development of a less mutagenic cigarette was the prudent and reasonable thing to do. Jacob told him he could not do that work. DiMarco replied that the industry medical/scientific witnesses lacked credibility and integrity. He told Jacob that outside lawyers and the rigid legal positions restricted the proper function of R&D. Dr. DiMarco wanted to research the benefits of smoking, but lawyers told him he could not.

161.    Jacob approached Dr. DiMarco about removing ammonia from the list of ingredients either through prior internal protocols or revising the protocols so as not to mention the inclusion of ammonia. Dr. DiMarco also told Jacob he would quit before letting them take ammonia off the list of ingredients because it would be misleading and dishonest.

162.    On March 12, 1983 Timothy Finnegan met with Dr. DiMarco to review a paper JMF was preparing for Reynolds Germany. Finnegan outlined problems they were having with Dr. Adlkofer in regard to his beliefs and open expressions that smoking causes lung cancer and

- 37 –

other diseases. DiMarco was confused because he thought Adlkofer worked for the industry. DiMarco agreed that a paper explaining the differing points of view between Adolkofer and Reynolds should be done in the U.S. JMF was tasked with preparing a draft using materials previously approved by legal committees. DiMarco mentioned "that the people in research had been turned off because they were told they could not do certain things by the lawyers." In response reviewed DiMarco's position on smoking and health.  On March 29, 1983, Sam Witt, General Counsel for Reynolds, drafted a paper that identified major risks associated with his continuing as R&D director and t discussed "legal concerns associated with [Dimarco's] position on the smoking and health controversy".

163.    DiMarco had called Wayne Juchatz, General Counsel for Reynolds, and expressed concern about the language in the proposed procedure for legal review of R&D projects. DiMarco and two or three other researchers were in agreement that the procedure gave the Law Department control over the nature of R&D work. Juchatz told DiMarco "that outside counsel had expressed serious concerns as to the litigation consequences in the event that our head of R&D did, in fact, believe that smoking caused cancer and was cross-examined in a smoking and health case."

164.    On December 31, 1985, a report monitoring Smoking and Health Literature produced by the outside law firm DAY for Reynolds R&D found Dr. DiMarco said Reynolds had given the responsibility of the Research Department in the area of smoking and health to the Law Department, and it was understood that the lawyers controlled things in this area. Dr. DiMarco and his staff said they were frustrated by the situation.

165.    On April 10, 1989, handwritten meeting notes show Dr. DiMarco asked the question:

> "Where can we go to grow the business? If we get the right product, price is not an issue." DiMarco brought up the viewpoint that there are positive reasons for smoking. "Should we put more emphasis on finding out the positive"..."Believes there is a value to smoking that has not been discovered.

166.    Outside lawyers took over access to a database of documents created by Reynolds's Research and Development division. Access to these documents was barred to the tobacco companies and their in-house counsel by outside counsel in order to conceal the documents.

167.    On March 10, 1983, in a memorandum written by Dr. DiMarco on the removal of materials from the R&D library in respect to the LRD (Literature Retrieval Division), DiMarco discussed whether Frank Colby, a scientific director with Reynolds, should continue to work for Reynolds or transfer to work directly for the law firm JMF.

168.    On December 4, 1984, hand-written notes titled "Colby Interview" (with JMF) state "FGC" (Colby) was hired to get all literature on tobacco, not just to assist lawyers in litigation but to keep the company informed. The notes indicate Colby gathered everything related to science and tobacco to establish data; Colby began microfilming everything housed in R&D in the 1950s; Colby left Reynolds because the LRD was no longer accessible to companies, including in-house lawyers, it was only available to outside litigating lawyers. Colby said when the order was given to remove documents from files, it came from the legal departments.

169.    Sometime in the 1990's, a document on the relationship between the US and German tobacco industries, stated Frank G. Colby held a position with Reynolds, went to work for JMF, and later became a sole proprietor of Frank G. Colby and Associates, with an employment agreement and benefits provided by Reynolds Tobacco through the DAY law firm, in the approximate amount of $120,000 a year plus retirement benefits at about $24,000 a year.

170.    A July 24, 1981 memorandum notes Outside counsel argued with Dr. Franz Adlkofer about T.I.'s decisions to publish statements that criticized the results of studies they knew were correct, and T.I.'s avoidance of epidemiological methods they knew would result in proof that smoking caused adverse health effects.

171.    On April 28, 1978, the Scientific Director for Reynolds, Frank Colby, forwarded a memorandum of a phone call with Dr. Adlkofer to Ed Jacob (JMF). Adlkofer was emphatic that important sources of information would dry up if the American cigarette industry leaked information that could be traced to the Verband, the Tobacco Institute's counterpart in Verband.

- 39 –

Adlkofer said there was no problem approaching members of the committee individually since there was no danger of tracing the info back to Verband.

172. Later that year in October, at a Nicotine Research Concept meeting, Adlkofer agreed to limit research to "disease" related problems and omit tests of nicotine as a single compound.

173. On February 16, 1981, Adlkofer met with Frank Colby at JMF's office. Adlkofer told Colby his days with the association would probably soon be numbered because tobacco companies were apprehensive about his statements that "smoking is the essential causal factor for lung cancer in addition to other factors". Adlkofer disagreed with Colby about the potential for development of liability in the European Community. Colby offered to step down as Scientific Director of Verband, to keep a position as secretary of the "Forshungsrat" (research council), which could be structured to satisfy Adlkofer, Verband, Reynolds, and Tobacco Industry.

174. On July 15, 1988, at a meeting on ETS in London, Adlkofer disagreed with John Rupp (COVINGTON), over what direction ETS research should  take. Adlkofer stated conventional epidemiological studies were not worth continuing, and that the industry should focus on "modern epidemiology" and the alleged mechanisms of effect. Rupp and other members said Adlkofer's suggestion would provide "a priori proof of causation". Additionally, Rupp argued existing studies are necessary, if for no other reason than to effectively respond to anti-smoking groups". At the end of the meeting, Dr. Adlkofer expressed disappointment that no new information had been presented.

175. Some of the specific researchers that were developed over time were funded solely to maintain good relationships and secure help contacting other scientists.

176. On January 11, 1983, a letter from SHOOK enclosed a chart of CTR Special Projects supported under Special Accounts 4 and 5. Dr. Jenson's HPV project was listed for two years at a budget of $60,000.

177. On December 30, 1983, Patrick Sirridge, of SHOOK, recommended that Dr. Jenson receive additional CTR Special Project funds for two years in the amount of $63,600. The proposed

new project was related to Jenson's previous CTR special project.  Jenson wished to study the presence of human papillomavirus in specific types of respiratory tract lesions. The proposal did not mention tobacco at all, and only mentioned cancer on the very last line of the proposal before the budget stating, "[a]nimal models utilizing papillomavirus could be used to study the mechanisms of carcinogenesis as it relates to carcinoma of the lung,".

178.    On January 9, 1984, Sam Witt, of Reynolds sent Sirridge a letter that confirmed funding for Dr. Jenson's research as a CTR Special Project.

179.    On March 8, 1984, Robert Gentenbach, the president of CTR, sent Dr. Jenson a letter that confirmed funding for two additional years of the special project. The letter stated that any credit line for future publications resulting from the project should state "Special Project of the Council for Tobacco Research-U.S.A., Inc."

180.    On December 6, 1988, Bernard O'Neill of SHOOK sent a letter approving a supplementary request for Dr. Jenson, that was considered granted unless other members voiced objections.

181.    On April 28, 1992, a letter stated SHOOK proposed giving Dr. Jenson $40,000 solely to maintain a good relationship and secure his continued help making contact with other scientists. Bill Allinder of SHOOK admitted the funding was not for specific research or with an eye to publication. Jenson had been facing problems receiving funding at Georgetown University stemming from his ties to the industry. SHOOK wanted to give Jenson money to keep him happy and knew that there was "no immediate value to his research".

### Lawyers developed witnesses in furtherance of the conspiracy

182.    David Hardy, a partner at SHOOK, played a major role in the industry's witness development plans to perpetuate the "open question" position.

183.    Shortly after joining Brown & Williamson Tobacco Co., as Vice President of Research and Development in 1989, Jeffrey Wigand, as part of his orientation, was required to go to Kansas City, Missouri to meet for three days with lawyers from the law firm of SHOOK.  At the session Wigand was "coached by lawyers regarding the company line on smoking and health,

- 41 –

and addiction." The company line was "[t]hat causation had not been proven and that nicotine had not been shown to be addictive." Similar orientation meetings took place with other tobacco scientists at SHOOK's offices.

184.    Wigand described the orientation session as follows:

Lawyers were instructing me, a scientist, how to interpret epidemiological studies. In every instance, I was instructed that the evidence in the public health domain had not satisfactorily proven causation. I was told that studies that demonstrated a link between smoking and cancer were fraught with errors. Moreover, I was told that epidemiology could not be relied upon because it was just statisticians doing guess work.

185.    A May 1967 letter from SHOOK attorney William Shinn, showed witnesses would avoid giving testimony on smoking being the cause of disease even though they privately held the opinion:

Specifically: Dr. S. would accept grants to study the effects of stress on animals, would speak and assist writers, would consult regarding ways to interest medical schools and doctors, etc. If such a program properly publicized his theories, he would testify before Congress. He would not give an opinion on smoking as a cause of any disease because he does not consider himself qualified. His private opinion is that smoking does cause some cancers to develop, may cause heart disease in some people and does cause bronchitis - he says these views are shared by all the doctors he knows but that these same doctors are willing to concede a beneficial diverting effect to smoking.

186.    The purpose of special projects was not only developing research, it also included developing witnesses. As one lawyer said at a September 10, 1981 meeting of the committee of general counsel "Lawyers cannot testify; we need people who can."

187.    A letter from Lee Stanford (SHOOK) to David Hardy (SHOOK) on briefing Dr. Alex Spears showed outside attorneys coaching responses designed to avoid lawyer involvement. In the letter Stanford stated,

CTR Special Projects, non-CTR projects and the Industry Research Committee are obviously very sensitive. Dr. Spears should be prepared to respond to questions in a way that does not lead [opposing counsel] into these areas. In particular, Dr. Spears should try to avoid references to the role of attorneys. However, this should not become too awkward . . . Dr. Spears should attempt to divert the questioning away from the involvement of attorneys.

- 42 –

188.    In 1966, letters from Frank Decker, of SHOOK, outlined visits with several doctors and scientists working on special projects. Decker concluded that Dr. Pratt could be developed into a witness, and Dr. Soloff might be persuaded that the validity of previous statements he made are questionable.

189.    On January 12, 1967, David Hardy (SHOOK) wrote to several other industry attorneys asking them for written comments regarding special projects and congressional hearings. Don Cohn and Francis Decker wrote back. They hoped materials being developed by Tom Hoyt for various Special Projects would be useful in developing a witness to emphasize the importance of multivariant analysis over univariant ones. Cohn and Decker also recommend development of two witnesses who could comment on diseases other than lung cancer. They would present the position that the claimed associations with smoking have not been proven to be causal. Also, they considered Dr. Pratt to be a potential witness. However, they said considerable work would have to be done before his attendance in Congress.

190.    William Shinn responded, if Dr. Seltzer of Harvard had Tom Hoyt's charts available and was willing to testify he might be able to use them to support a theory that lung cancer is not associated with cigarette smoking any more than it is with a constitutional theory. Shinn stated he had "in mind charts showing the male-female ratio, peak age, etc."

191.    On February 2, 1967, a letter from William Shinn recapped interviews he had with Alex Holtzman, and Frank Decker for Dr. Carl Seltzer regarding a paper on Constitutional Factors theory (a genetic predisposition for early mortality that is linked to difficulty adapting to the problems of existence). Shinn wrote that he hoped Seltzer would develop the available material that supports their alternative answer because they need a witness (for congressional hearings) who would review Tom Hoyt's statistic charts and prepare a presentation using them. Shinn suggested that if Seltzer had charts and was willing to testify, he might be able to use them to support a theory that lung cancer is not associated with cigarette smoking.

192.    On February 5, 1974, SHOOK recommended a grant for Dr. Carl Seltzer, for $50,000 as a CTR Special Project. Seltzer was given an extension to continue one year beyond

normal retirement. SHOOK acknowledged the grant requested is not the kind normally provided from the CTR budget since it is not oriented to any project and financing for Dr. Seltzer in the past has been through a "special project" type grant.

193.    On January 17, 1977, a letter from Dr. Charles Waite to Horace Kornegay discussed a visit to Kansas City with Bill Shinn (SHOOK), Don Hoel (SHOOK), and Tim Finnegan (JMF). Waite stated, "particular emphasis was placed on the pitfalls of assurance of safety and the avoidance of conspiracy to undermine health warnings at all costs." Waite was told to become familiar with the Fisher hypothesis (on causation), Seltzer's theory of Burch's constitutional hypothesis theory, and review the Auerbach reports. Waite's own work was discussed and edited with a view toward a rewrite. Waite was told, "future reviews for spokespersons must not carry too much detailed information,".

194.    On March 7, 1980, SHOOK recommended approval of Dr. Seltzer's request for renewal of his CTR Special Project administered through the Peabody Museum, at a rate of $70,000 through June 30, 1981.

195.    Researchers that were willing to change their methodology to conform with CTR's wishes were selected to continue to receive funds and eventually developed into witnesses.

196.     On January 8, 1973 the Committee of Counsel met at the Tobacco Institute and discussed Dr. Rao, a steroid biochemist who requested grant money from CTR to fund research into a theory that lung cancer is an endocrine disease. Rao switched his methodology, from urinalysis to blood analysis because it was CTR's preferred method. In light of this, Hardy and Jacob said Rao would become an important witness.

197.    On September 26, 1977, Ed Jacob (JMF) recommended funding Dr. Rao through Special Account No. 4 (lawyer run projects) since the research was not appropriate for consideration as a CTR special project, yet still of value because under appropriate circumstances, he might be able to provide useful information to a Congressional Committee or other body inquiring into certain aspects of smoking and health.

198.    On December 1, 1986, SHOOK statement for services and expenses indicated Rao still received Special project funds. Under "CIGS-Science and Research" services included "Review Rao Special Project".

199.    On February 6, 1981, Patrick Sirridge recommended Dr. Blau's non-CTR special project collecting and evaluating literature on the "tobacco habit" be renewed for an additional year.

200.    On March 5, 1982, at a House of Representatives Subcommittee on Health and The Environment Committee on Energy and Commerce. Dr. Blau testified "There is no scientific basis for a statement that cigarette smoking is addictive."

201.    On April 2, 1982, Patrick Sirridge recommended a research grant as a Special Fund 4 project for Dr. Blau.

202.    On June 3, 1985, a Reynolds report on addiction stated, "Patrick Sirridge of Shook, Hardy, and Bacon has been developing Dr. Blau's testimony since 1979."

203.    On October 24, 1985, a letter from Patrick Sirridge recommended Dr. Blau's project be renewed for another year because the project was educating Dr. Blau. The letter stated, "given the rapid growth of the field the project has helped Dr. Blau maintain his expertise in this important area". Additionally, the letter emphasized that Dr. Blau's project was important "since questions relating to the motivations for smoking have arisen in a variety of forums such as the current litigation".

204.    The tobacco industry was warned by lawyers not to warn the public about smoking. In 1975, David Hardy (SHOOK) advised British American Tobacco Co. (BATCo) against admitting to the public what its scientists knew internally -- that smoking causes disease. At the time, BATCo was considering placing a warning on cigarette packages sold in England -- with no government attribution -- that stated that smoking "causes lung cancer, bronchitis, heart disease." In a letter addressed to BATCo, Hardy advised that this admission of fact would impede the defense of smoking and health litigation in the United States. He wrote:

- 45 –

The proposed new warning removes the attribution of the warning to "H.M. Government," and instead appears to be a voluntary and direct admission by the cigarette manufacturer that the cigarettes contained in the package cause "lung cancer, bronchitis, heart disease." A wholly owned subsidiary of the manufacturer would, in our opinion, be adversely and prejudicially effected by such a voluntary warning even though it is a separate entity. Once the fact and content of the warning got before a jury in the United States in a case involving the subsidiary, the defense of "no proof of causation" would be lost for all practical purposes. Such a result would indeed be unfortunate in view of the fact that in every instance where the matter has been explored in our Courts through expert testimony and otherwise, the cigarette manufacturer has prevailed.

205. Lawyers directed the industry away from valid research that could be performed.

206. Lawyers did not allow funds to go to qualified groups and individuals that held beliefs contrary to the industry position, that smoking did not cause negative health effects.

207. For example, on August 9, 1978, William Shinn of SHOOK received a letter from Leonard Cornell of the Addiction Research Foundation, requesting $400,000 to construct a laboratory for research on tobacco. The foundation hypothesized that there was a hormone produced in the body which functioned like nicotine. If this natural hormone could be combined with the flavor of tobacco it could be less toxic.

208. On August 15, 1978, Shinn forwarded the letter to industry attorneys and planned to tell Cornell that he could not advise him on any of his inquires.

209. By September 6, 1978, Cornell contacted Lorillard and other tobacco companies individually, stating that the foundation now had a finding of nicotine receptors in the brain of rats which corroborated the foundation's theory about hormones which functioned like nicotine.

210. On September 12, 1978, B&W responded to the request for a grant, stating that they had already committed all of their health research funds for the year.

211. On September 19, 1978, a letter from a T.I. representative addressing Cornell's letter stated sarcastically that he wondered why the tobacco industry might not be interested in light of the Addiction Research Foundation's assumptions that tobacco and nicotine are addictive, smoking costs the U.S. citizen billions a year, and that it causes 300,000 premature deaths annually.

- 46 –

212.    Outside counsel reversed decisions made by in-house counsel concerning the publication of industry sponsored research.

213.    On January 10, 1983, a manuscript of Dr. Victor Denoble's study results concerning nicotine was approved by Philip Morris for publication in Science Magazine, a peer-reviewed journal.

214.    A July 27, 1983 letter to the head of Philip Morris from SHOOK attorney Patrick Sirridge summarized the nicotine research being conducted by scientists and recommended its suppression. Sirridge pointed out the legal implications of the "unfavorable" Philip Morris internal nicotine research:

> Research engaged in, as well as some possibly under consideration, by Philip Morris has undesirable and dangerous implications for litigation positions the industry takes in regard to smoking behavior. The pharmacological nature of the research implies strongly a view of the importance of nicotine. What is worse, research reports under Philip Morris' sponsorship contain claims of unequivocal demonstrations of reinforcement by nicotine in animals. This kind of research is a major tool of our adversaries on the addiction issue; the irony is that industry-sponsored research is honing that tool. In the final analysis, the performing and publishing of nicotine related research clearly seems ill-advised from a litigation point of view.

215.    In April 1994, a SHOOK report titled "Philip Morris Research of Nicotine Pharmacology and Human Smoking Behavior" describes which research was never made public and the relationship of that research to sales of Philip Morris products. "Nicotine/Acetaldehyde" research conducted by Dr. DeNoble in 1982 showed that acetaldehyde and nicotine functioned as "positive reinforcers:":

> CAVEAT: This research has never been published. There is nothing in the literature regarding the synergistic effects of nicotine and acetaldehyde. In addition, see description below re: Frank Ryan data on predicting sales.

216.    Upon learning that acetaldehyde functions as a positive reinforcer, they endeavored to study the combined effects of nicotine and acetaldehyde on self-administration. Results indicated that reinforcing effects of these agents are additive.

- 47 –

217.    Research done by Frank Ryan indicated that acetaldehyde and nicotine data could be used to predict cigarette sales at a 96% accuracy. . . . Frank Ryan ran a program and was able to predict blindly which cigarettes would sell and which wouldn't base on the combination of nicotine and acetaldehyde delivery.

218.    The 1994 SHOOK report acknowledges that DeNoble's, research was suppressed:

"[H]e was not allowed to publish the research regarding the effects of nicotine and acetaldehyde." This occurred "after a letter from Shook, Hardy to the Philip Morris Legal Department and discussions between [attorney] Alex Holtzman and [scientist] Jim Charles."

219.    In a later section of the 1994 report, SHOOK described how nicotine research undermined Philip Morris's public position denying addiction, and could invite regulation by the FDA:

D. Why Was Research Stopped

1.    Sensitivity. [CAVEAT: Significance is self-evident.]

According to DeNoble, "we were the only tobacco company that I knew of, or that anybody else knew of, doing work with whole animals, live whole animals, and because of the nature of the research, that is, looking at self-administration, looking at the effects of nicotine on the brain function, the research was held restricted to upper management only."

DeNoble discussed the effect of his research on the company with Dr.Charles, Dr. Osdene, Dr. Pages, Mr. McDow, Max Hausermann, Mr.Pollock, and Jim Remington. . . . "The downside was that we were doing whole animal research, which looked to them like we were doing Federal Drug Administration research."

DeNoble understood that the research he was doing could undermine the public posture Philip Morris was taking with outsiders.

DeNoble discussed with Jim Charles and Tom Osdene the potential damage to the company of continuing animal research.

220.    In April 1994, Dr. Denoble testified that he had authored a paper that was accepted for publication but was told if it were published it wouldn't be good for litigation. Denoble was forbidden from making a poster presentation at the American Psychological Association because it would not look good in litigation. Shortly after that, attorneys from SHOOK set up a copy

machine in Denoble's office and began reviewing and copying all of his work. Denoble's work was discontinued when he was told to shut his equipment off, terminate the experiment, and to kill all the animals the following day. Philip Morris provided him with an office and funds to look for other jobs. Denoble's request to complete the manuscripts of data already collected was denied. In December 1985, and 1986, Denoble attempted to publish and present some of his work because as he testified, "[t]his information wasn't going out simply because the company didn't like what it said. And that was unacceptable. In 1986 people still weren't close to doing this kind of research."

221.    None of the results or conclusions from the Philip Morris Nicotine Program or Behavioral Research Program were made public or were included in Philip Morris's and the industry's collective submission to the FDA in 1996. In fact, Volume III of the industry's "Comments" to the FDA deny FDA assertions that research existed showing that nicotine is addictive.

222.    Outside lawyers made representations to the general public about smoking and health.

223.    While internally, SHOOK advised the Defendants not to publicly admit what the industry already knew about the harms of smoking, publicly, they were drafting false and misleading statements.

224.    In November 1967, at the direction of outside lawyers David Hardy (SHOOK), and Ed Jacob (JMF), and the Tiderock Corporation, a public relations firm working for the Tobacco Institute, prepared an action plan titled "The Cigarette Controversy." The action plan proposed to influence public opinion by creating specific initiatives to re-open the "open question" cigarette controversy. The program called for the creation of a position paper for intra-industry use as well as one for distribution to the media and public. The plan included targeted categories for mailings such as the medical profession, scientists, communicators (press, radio, and television), educators, top public figures, and 10,000 top corporate presidents. It also detailed the publication of magazine articles.

- 49 –

225.    On May 22, 1967, David Hardy of SHOOK sent a letter to Committee of Council members. Accompanying the letter was what Hardy referred to as "our Position Paper". Hardy indicated he had reviewed the paper and felt it was a "comprehensive job". The paper admits that smoke condensate caused skin cancer in mice but questions whether smoking was a definite cause of cancer.

226.    On May 27, 1969 David Hardy of SHOOK sent a Letter to Dr. Robert Hockett (CTR Scientist) that included a paper SHOOK prepared explaining in non-technical terms why representatives of the industry contend that the case against cigarettes has not been proven titled "Cigarette Controversy Eight Questions and Answers".

227.    On November 21, 1967, William Shinn of SHOOK, made a radio appearance on a program, called "Night Talk," where he advocated on behalf of the industry. Shinn was introduced as a "special Assistant to the President of the Tobacco Institute", and was accompanied by Addison Yeaman, the Vice President and General Counsel for B&W, who would later become the President and Chairman of CTR.  During the interview Shinn stated that "a lot of local doctors, not being cancer specialists, not being pathologists, not being in an area where they themselves can go in and make an independent determination, feel because of the pressures that have been created, that perhaps they need to set an example for their patients . . . there are many doctors who do not believe that the case against cigarettes has been proved."

228.    On October 13, 1977, Shinn sent a letter to Alex Holtzman, General Counsel for Philip Morris, enclosing a preliminary draft of a paper titled "Cigarettes and the Cardiac-Cancer Cartel". Shinn wrote that the draft contained "major errors" and that he had not "attempted to rewrite the paper."  Later, the paper was used as a public statement made by Clifford Goldsmith, the CEO of Philip Morris, to criticize private and public health agencies by claiming their statements about smoking and heart disease went beyond the boundaries of fact, reason, and decency.

229.    On April 17, 1978, a letter from Edwin Jacob (JMF) delivered a position paper titled "Public Smoking" drafted for Reynolds. Jacob indicated that the paper was used as the basis

- 50 –

for an international position paper still under draft. The paper relied upon research funded by the tobacco industry without disclosing that the work was funded by the industry.

230.    On October 15, 1981, Donald Hoel of SHOOK sent a letter to Horace Kornegay, attorney for T.I., enclosing the most recent draft of the "Public Smoking Paper" SHOOK prepared for use by INFOTAB (International Tobacco Information Center/Centre International d 'Information Du Tabac, registered in Geneva, Switzerland). Hoel wanted Kornegay to have a copy of the paper despite the fact it had not been officially cleared by all members.

231.    In 1981, the Tobacco Institute published a document titled "On Smoking -- 21 questions and answers," written by the law firm SHOOK, which stated:

> The tobacco industry has committed more than $91 million for independent research on smoking and health questions. . . . The tobacco industry remains committed to advancing scientific inquiry into the gaps in knowledge in the smoking controversy.

232.    In 1990, the tobacco industry's international lobbying organization, INFOTAB, issued a publication titled "Children & Smoking -- The Balanced View" that addressed various World Health Organization claims. It stated that cigarettes are not addictive, and that there were inconsistent findings as to whether smoking causes low birth weight, birth defects, and delayed mental and physical development in infancy.

233.    Sometime after 1990, general counsel for B&W sent an "Addiction Statement" attributed to Robert Northrip of SHOOK. Northrip stated smoking must be characterized as a habit because in-part people have been able to quit, therefore, the "behavior is simply not consistent with any reasonable use of the term addiction". Northrip concluded with a warning, "statements in company documents cannot refute this conclusion,".

234.    A June 20, 1984 memorandum, written by an SHOOK attorney, Wendell L. Stone, summarizes the significance of CTR-funded nicotine research for industry clients. In his memorandum, Stone conceded that:

- 51 –

Of the three areas pertinent to Cipollone[1] (lung cancer, emphysema, and addiction) the abstracts and CTR commentary regarding addiction are the most consistently adverse. Through the years, CTR has funded psychopharmacological and neuropharmacological studies which emphasize and leave clear the points that CTR views nicotine as a "psychoactive" or "psychotropic" drug (terms which CTR has used), and that the research approach most appropriate to studying smoking behavior involves the pharmacology of nicotine. Among the undesirable research claims which appear in abstracts which acknowledge CTR support: the identification of specific central nervous system structures (nicotine receptors) at which nicotine acts; effects of nicotine on a variety of different purported neurotransmitters involved in learning, memory, etc.; various behavioral effects of nicotine from which can be inferred central nervous system effects, some of which might be used to support assertions regarding "tolerance" and "withdrawal."

235.    In a June 3, 1985, Reynolds document titled "Report on Medical and Scientific Issues -Addiction," the scientist authors attempted to examine current scientific literature to assist the industry with respect to the scientific consensus on nicotine addiction. As part of their review, the scientists reviewed literature compiled by the tobacco law firms JMF, SHOOK, and DAY. The scientists wrote in their report that, "Both Mr. Wrobleski [(JMF)] and Mr. Sirridge [(SHOOK)] warned, however, that there is very little literature favorable to the industry's position on addiction."

236.    Notes from an October 1984 meeting with outside lawyers at JMF reference Bob Suber, Reynolds' Director of Health and Environmental Studies, critique of the CTR, including that it is "very sloppy as far as research" and that it is "a way for the company to 'launder' money for research."

237.    In 1990, BAT held a series of mandatory training sessions about writing and document creation for company scientists. "The sessions were called 'caution in writing' seminars and at Brown & Williamson they were presented by lawyers, predominantly from Shook, Hardy & Bacon."  At the seminars, scientists were instructed by lawyers "on how to sanitize the documents they created." The scientists were told "how to avoid writing documents with

---

[1]*Cipollone v. Liggett Group*, 505 U.S. 504 (1992), was one of the first tobacco lawsuits in which the industry was assessed damages. It was particularly significant to the industry because it involved the unprecedented use of thousands of internal industry documents.

contentious words and topics." The contentious words included words like "safer," "addictive," "disease," and "cancer."

238. In a January 29, 1974 report concerning the progress made by Liggett in 1973 on Project TE 5001, James R. Newsome, an attorney with SHOOK, explained: "[future plans on this project will consist of screening a number of basic materials on both the cigarette filter and blend in an attempt to find which additive is most effective in producing a smoke able increased smoke pH cigarette."

239. Up to a year prior to the release of each Surgeon General's Report on Smoking and Health, the Defendants would start planning their response to what they expected it to say. That response included establishing a task force to write and publish a rebuttal paper. Rather than have scientists evaluate the evidence or the Report's findings, once they were issued, the Tobacco Institute assigned a public relations staff member to research, write, and edit the rebuttal paper. Anne Duffin was given this responsibility multiple times, under the direction and guidance of the law firm SHOOK. Other public relations staff members re-read and edited chapters of the document as it was drafted.

240. On September 21, 1978, T.I. began to formulate plans to preemptively present the industry's position before the 1979 Surgeon General's Report. A report to the executive committee detailed the plans included staging counter media events preempting the Surgeon General's Report by one day. Anne Duffin (T.I.) was preparing a readable lay critique which would be made available the same day.

241. On January 19, 1979, a T.I memorandum outlined that in order to frustrate the impact of the Surgeon General's 1979 report, the industry decided to hold a news conference the day before the scheduled release of the report. In response to learning that advance copies of the report would be distributed to news outlets at the same time, the industry moved its conference up three hours.

242. In April 1981, Anne Duffin sent a letter to Patrick Sirridge, of SHOOK, with an attached marked-up copy of the "On Tobacco" report. Most of the information contained within

- 53 –

the report had been cleared previously. Some of the revisions substantively alter what the document conveys i.e.:

> Original version: In 1977, the director of the government agency responsible for coronary heart disease (CHD) research told a Congressional committee, 'We still don't know the etiology of arteriosclerosis and hypertension.' In January 1981, the Surgeon General's newest report on smoking and health said the same thing.

243.    Edited version: In early 1981, a past president of the American Heart Association said it best when he told a New York reporter, "We have yet to uncover what causes atherosclerosis, responsible for heart attack and stroke." In January 1981, discussing smoking and cardiovascular disease the Surgeon General's newest report pointed out that "correlation is not synonymous with causation."

244.    On October 12, 1982, the industry began planning again to attempt to blunt the impact of the upcoming 1983 Surgeon General's Report. The Scientific Division of T.I. was assigned to prepare a brief paper with a 10-day deadline, while SHOOK attorneys would provide clearance of the paper and its final format between October 22 and December 1, a 40-day deadline).

245.    In August 1986, T.I. began a project to reply to the 1986 Surgeon General's Report on ETS, planned by IAPAG (Indoor Air Pollution Advisory Group) working with COVINGTON.

246.    On March 15, 1994, a letter from Paul Crist (DAY), to John Rupp (COVINGTON) stated the industry was in substantial agreement with the Surgeon General on what the available scientific evidence showed, yet, disagreed on whether cigarettes caused disease, rather, the industry believed smoking was a risk factor.

247.    As early as 1970, however, attorneys at SHOOK wrote a seven-page letter to B&W's General Counsel expressing concern that BAT Group research documents would be subject to discovery and that these documents "constitute a real threat to the continued success in the defense of smoking and health litigation."

248.    The TRC was re-named the Tobacco Advisory Council ("TAC") on August 31, 1978.  Various members of the conspiracy participated in the TAC, including BATCo, Reynolds,

and Philip Morris, John Rupp (COVINGTON), and Don Hoel (SHOOK). The last TAC meetings occurred in May of 1999.

249.    CTR Special Project funding ended sometime around 1990. Thereafter, Philip Morris, Reynolds, Lorillard, Liggett, B&W, and American continued to jointly fund research projects on behalf of the conspiracy through Lawyers Special Accounts. On March 2, 1990, Arthur Stevens, Senior Vice President and General Counsel of Lorillard sent a letter to Patrick Sirridge, of SHOOK, enclosing a check for $46,461, which represented Lorillard's share of joint funding for Theodor Sterling, a long-time CTR Special Projects grantee. Stevens noted "that this is no longer a CTR project, but is now being funded directly by the Companies and administered as a Special Research Project through your firm."

250.    Similar acknowledgments were made in prior communications.  In 1982, a memorandum summarizing incoming Reynolds' R&D scientist, Dr. Robert DiMarco, states the view that, "our medical/scientific witnesses will say whatever we want them to say – clearly implying (if not stating) that they lacked credibility and integrity."

251.    A June 28, 1988 memorandum addressed to Toss Sollis, Assistant General Counsel of Philip Morris, from Donald Hoel, an attorney with SHOOK, described the central role played by SHOOK, with respect to INFOTAB.  Hoel stated:

> SHOOK, as counsel to PM and other international manufacturers, was instrumental in the founding of INFOTAB to help strengthen and coordinate the activities of the various national manufacturers associations. The firm remains active in the operation of INFOTAB. It monitors the meetings and clears the draft minutes of the INFOTAB Board of Directors and the Global Issues Working Party, as well as INFOTAB workshops. All materials prepared by INFOTAB on smoking and health issues, including briefing documents sent to national manufacturers associations and presentations by the INFOTAB staff, are cleared by SHOOK in order to protect the member association and member companies. SHOOK also approves all public relations campaigns, tactics and strategies which address smoking and health issues.

252.    A 1989 INFOTAB document outlined how to attack the WHO [World Health Organization].  The tactics it suggested included the following:

Criticize budget management, Address health priorities, Expose resource blackmail, Highlight regional failures, Attack "behaviourism," Counter on public issues, Discredit activists' credentials, Engage in statistical warfare, Invest in press relations.

253.    The defendant law firms directed their fraudulent conduct, both in and outside the State of Hawai`i, and that of Philip Morris, RJ Reynolds, Liggett, and their co-conspirators, throughout the United States, including to the State of Hawai`i, and knew such fraudulent conduct would have a substantial effect on consumers located in Hawai`i, including Marvin Manious.

## COUNT I
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT (Reynolds)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 253 of this COMPLAINT as though set forth in full in this cause of action.

254.    This count applies to the following Defendant ONLY: REYNOLDS.

255.    Defendant was and has been a designer, manufacturer, advertiser, distributor and/or seller of cigarette products identified above in the Complaint.

256.    The cigarette products complained of identified above in the Complaint designed, manufactured, advertised, distributed and/or sold by Defendant and used by and/or in the vicinity of the Plaintiff.

257.    The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by Defendant.

258.    Plaintiff alleges he was exposed to Defendant's cigarette products identified above in the Complaint over many years during which time smoke from Defendant's cigarette products was inhaled by the Plaintiff which caused him to develop laryngeal cancer, and/or other injuries.

259.    At the time Defendant designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach the Plaintiff in a condition without substantial change from that in which such products were when within the possession of Defendant.

- 56 –

260.    Defendant's cigarette products identified above in the Complaint were in a condition unreasonably dangerous to users and/or bystanders, such as the Plaintiff, and said products were expected to, and did, reach the Plaintiff without substantial change affecting that condition.

261.    Defendant's cigarette products identified above in the Complaint were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as the Plaintiff, and said products were expected to, and did, reach the Plaintiff without substantial change affecting that condition.

262.    Defendant's cigarette products identified above in the Complaint were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as the Plaintiff, outweighed the benefits.

263.    Defendant's cigarette products identified above in the Complaint were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendant.

264.    Defendant's cigarette products identified above in the Complaint were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

265.    Defendant's cigarette products identified above in the Complaint were in a defective condition, unreasonably dangerous, in that those products:
- by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to the Plaintiff;
- contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;
- failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as the Plaintiff herein;
- through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products identified above in the Complaint more tasteful, pleasurable and

- 57 –

less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

- utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;
- the nature and degree of the danger of Defendants' cigarette products identified above in the Complaint were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;
- by designing and manufacturing their cigarettes to be inhalable and thus defective and unreasonably dangerous; and/or,
- by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

266. The Plaintiff was unaware of the defective and unreasonably dangerous condition of Defendant's cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendant's cigarette products.

267. Defendant knew that its cigarette products identified above in the COMPLAINT would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

268. The Plaintiff was unaware of the hazards and defects in the cigarette products identified above in the Complaint of Defendant, to-wit: that exposure to said products would cause the Plaintiff to develop cigarette related disease(s) which made said products unsafe for use.

269. Defendant's cigarette products identified above in the Complaint failed to perform as safely as the Plaintiff expected they would in that they caused diseases, in addition to other related physical conditions, which resulted in and directly caused him to suffer severe bodily injuries as a result of inhalation of cigarette smoke from Defendant's cigarette products.

270. The Plaintiff suffered diseases in addition to other related physical conditions. As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE (Reynolds)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 270 of this COMPLAINT as though set forth in full in this cause of action.

271.    This count applies to the following Defendant ONLY: REYNOLDS.

272.    The cigarette products identified above in this Complaint and complained of were designed, manufactured, advertised, marketed, distributed and/or sold by Defendant, which the Plaintiff used and smoked in his daily life.

273.    Defendant owed the Plaintiff a duty to exercise reasonable care in the design, development, testing, marketing, promotion, packaging, sale, and/or distribution of the cigarettes identified above in this Complaint.

274.    Defendant owed the Plaintiff and other foreseeable users, a duty to disclose through their marketing efforts the ever-growing knowledge that smoking cigarettes is quickly and powerfully addictive and causes lung cancer, chronic obstructive pulmonary disease, heart disease and other serious human diseases.

275.    Plaintiff alleges the Plaintiff was exposed to Defendant's cigarette products as smokers and/or bystander. Each exposure to such cigarette products of Defendant, caused the Plaintiff to inhale smoke from said products which caused the Plaintiff to develop smoking related diseases referenced above in this Complaint in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries. Each exposure to such cigarette products was harmful and caused or contributed substantially to the Plaintiff's aforementioned injuries. The Plaintiff's aforementioned injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendant of its cigarette products.

276.    The Plaintiff was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendant.

- 59 –

277.    The aforementioned damages of the Plaintiff are the direct and proximate cause of the negligence of Defendant, in that it produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which Defendant knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to the Plaintiff's health and well-being.  Defendant, prior to selling and/or distributing cigarette products, to which the Plaintiff was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause addiction, and injuries including, but not limited to, lung cancer, laryngeal cancer, throat cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death.  Defendant also knew that the Plaintiff and others similarly situated would use and be exposed to its cigarette products in such a way as to cause the Plaintiff inhale the smoke from said products.

278.    Defendant's cigarette products identified above in the Complaint contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time the Plaintiff was exposed to them in that said products contained tar, nicotine, and other harmful substances which Defendant knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, throat cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as the Plaintiff who used and/or was exposed to them.

279.    Defendant knew that its cigarette products would be used by and around the Plaintiff without inspection for defects and that any such inspection would not have advised the Plaintiff of the fact that Defendant's cigarette products could cause the injuries which he suffered. Such facts made Defendant's cigarette products inherently and unreasonably dangerous in that the Plaintiff was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the aforementioned injuries as a result of his exposure to the inhalation of the cigarette smoke of Defendant's cigarette products which he used or was exposed to.

280.    Plaintiff alleges that there were methods of design and manufacture available and/or known to Defendant and unknown to the Plaintiff which could have been used by Defendant in

- 60 –

the design and manufacture of its cigarette products identified above in the Complaint to which the Plaintiff was exposed to make such products less dangerous. Defendant was in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products identified above in the Complaint during the times pertinent to this suit, and knew that the Plaintiff and others similarly situated would come in contact with its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life threatening injuries including, but not limited to, lung cancer, laryngeal cancer, throat cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. Defendants were negligent in all of the following respects, same being the proximate cause of the Plaintiff's injuries, and disabilities which acts of negligence have continued to the present time:

a. in designing and developing cigarette products identified above in the Complaint that were milder, had better taste and contained nicotine so that foreseeable users, such as the Plaintiff, would find smoking Defendant's products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

b. in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products identified above in the Complaint Defendant designed, manufactured, advertised, marketed, distributed and/or sold;

c. in continuing to manufacture, distribute and sell the defective and unreasonably cigarette products identified above in the Complaint when Defendant knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, COPD, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, and heart disease to foreseeable users, such as the Plaintiff, when used as intended;

d. in concealing information while affirmatively misrepresenting to the Plaintiff and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products identified above in the Complaint manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced the Plaintiff to unknowingly use and/or continue to use Defendant's cigarette products identified above in the Complaint and expose themselves to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, COPD, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, and heart disease;

- 61 –

e.   in failing to test and/or adequately test Defendant's cigarette products identified above in the Complaint before offering them for sale and use by the Plaintiff, and other persons similarly situated;

f.   in failing to remove and recall said defective and unreasonably cigarette products identified above in the Complaint from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, COPD, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, and heart disease, some or all of which are permanent and fatal;

g.   in manipulating, failing to reduce and/or eliminating nicotine from Defendants' cigarette products identified above in the Complaint to prevent the Plaintiff, who was addicted to the nicotine in Defendant's cigarette products, from quitting and/or reducing consumption;

h.   in including nicotine, or artificially high levels of nicotine, in Defendant's cigarette products identified above in the Complaint to prevent the Plaintiff and other persons similarly situated from quitting and/or reducing consumption;

i.   in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j.   by designing and manufacturing their cigarette products identified above in the Complaint to be inhalable and thus unreasonably dangerous; and/or,

k.   by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

281.   Defendant's cigarette products identified above in the Complaint to which the Plaintiff was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendant.

282.   Defendant's cigarette products identified above in the Complaint failed to perform as safely as the Plaintiff expected they would in that they caused them to develop smoking related disease identified above in this Complaint, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries as a result of inhalation of cigarette smoke from Defendant's cigarette products.

283.   Each of Defendant's cigarette products identified above in the Complaint suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic

- 62 –

chemicals, toxic gases, nicotine, tars and other substances which Defendant knew or should have known were extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

284. Defendant owed a duty to Plaintiff to exercise reasonable care in the design, and/or sale of the cigarette products identified above in the Complaint to protect against reasonably foreseeable risk of injury and/or damage.

285. Defendant breached its duties to the Plaintiff as described above; and, as a direct and proximate result of these breaches, Plaintiff has lost a chance at a better outcome and/or suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

## COUNT III
## FRAUD BY CONCEALMENT (Reynolds)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 285 of this COMPLAINT as though set forth in full in this cause of action.

286. This count applies to the following Defendant ONLY: REYNOLDS.

287. Beginning at an exact time unknown to the Plaintiff and continuing even today, the cigarette manufacturers, including Defendant herein, have carried out, and continue to carry out a campaign designed to deceive the public throughout the United States including in Hawai`i, the Plaintiff, physicians, the government and others as to the true dangers of smoking cigarettes. Defendant and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

   a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendant's cigarettes did in fact contain carcinogenic materials;

   b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

   c. the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

- 63 –

d.  the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e.  the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f.  the risks of contracting cancer, including but not limited to lung cancer and throat cancer, from smoking cigarettes;

g.  the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h.  that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i.  that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j.  the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k.  the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l.  the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m.  that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n.  that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o.  that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendant's cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p.  that smoke from Defendant's cigarette products identified above in the COMPLAINT caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q.  that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke;

r.  that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker; and/or

t.  by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, Defendant and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

288.   The cigarette manufacturers, including Defendant herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by Defendant and have withheld and/or failed to release over the last almost 65 years both because he does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendant herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

- 65 –

289.    The cigarette manufacturers, including Defendant herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

290.    In 1953 Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MEYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MEYERS, Mr. Darkis writes:

> If Chesterfield turn out to be negative, and X (used by Wydner) as positive, it would then be possible to say, that by using Dr. Wydner's techniques, Chesterfield did not produce cancer in mice.

Of course, when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

291.    A confidential "limited" LIGGETT & MEYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

a. There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

- 66 –

b.  What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

This document was written by an industry consultant for LIGGETT & MEYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MEYERS. This memo contained material facts known to and concealed by Defendant since at least 1961 and unknown to the Plaintiff.

292.    In 1964, the TIRC changed its name to CTR and was joined by Defendant, LIGGETT & MYERS. Defendants, REYNOLDS and PHILIP MORRIS, were founding members of the TIRC/CTR.  The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

293.    Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

294.    Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from the Plaintiff and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

- 67 –

The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox.

295.    In a July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation".

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed industry insiders knew it was nothing more than a "public relations" sham.

296.    In that same July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

Moreover, nicotine is addictive.  We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:

1) They cause, or predispose to, lung cancer.

2) They contribute to certain cardiovascular disorders.

3) They may well be truly causative in emphysema, etc, etc.

297.    The 1964 Surgeon General's Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite

- 68 –

what the industry told the public the industry clearly understood that nicotine was addictive and cigarettes were a cause of lung cancer and other diseases.

298.    The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendant herein, and their co-conspirators was material information which Defendant was under a duty to disclose and/or which it had assumed the duty of disclosing.

299.    The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendant herein, and their co-conspirators was concealed for the purposes of inducing the Plaintiff to smoke, fail to quit or fail to reduce consumption for Defendant's own pecuniary gain.

300.    The Plaintiff and others similarly situated justifiably relied upon the cigarette manufacturers, including Defendant herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to repeatedly and publicly deny the harms of smoking and the addictive nature of cigarettes/nicotine. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendant herein, and their co-conspirators was concealed for the purposes of inducing the Plaintiff to smoke, fail to quit or fail to reduce consumption. The Plaintiff was unaware of the extent of the danger of Defendant's cigarette products, the addictive nature of Defendant's cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the cigarette manufacturers, including Defendant herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than the Plaintiff.

301.    During differing time periods of the Plaintiff's smoking history, Plaintiff heard, read and saw statements and advertisements by Defendant, and or its agents and representatives, including, but not limited to: that smoking was not harmful or addictive, smoking had not been proven to be harmful or addictive; and that light, low tar and filter cigarettes were less harmful. The Plaintiff

- 69 –

believed the statements, began and continued to smoke, and/or made decisions regarding the cigarette brands they smoked based on those statements and advertisements.

302. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendant herein, and its co-conspirators, Plaintiff smoked and/or continued to smoke Defendant's cigarette products identified above in the Complaint which caused him to sustain injuries.

303. As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

## COUNT IV
## CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT (Manufacturers)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 303 of this COMPLAINT as though set forth in full in this cause of action.

304. This count applies to the following Defendants ONLY: PHILIP MORRIS, REYNOLDS, and LIGGETT.

305. Defendants, along other tobacco manufacturers, and the Council for Tobacco Research (CTR), The Tobacco Industry Research Committee (TIRC) and Tobacco Institute (TI), along with attorneys and law firms retained by Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public throughout the United States including in Hawai`i would rely on this information to their detriment. Defendants agreed to execute their scheme by performing the above mentioned unlawful acts and/or by doing lawful acts by unlawful means.

306. Defendants PHILLIP MORRIS, REYNOLDS and later LIGGETT, along with other entities including the TIRC (CTR), TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

307.    Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

308.    After the year 2000, and on a continuing basis, Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

b. Failing to acknowledge that cigarettes are responsible for hundreds of thousands of deaths each year in the U.S.;

c. Failing to acknowledge that nicotine in cigarettes "is" addictive and an indispensable link to the linking between smoking and diseases;

d. Failing to acknowledge the existence of a conspiracy or that Defendants have ever made ANY false or misleading statements to the public and or concealed from the public any false or misleading statements about the harms and addictive nature of smoking;

e. Continue to promote smoking and other tobacco products to underage smokers.

f. Continue to design and market and promote Menthol cigarettes knowing that Menthol is an anesthetic and allows smokers to inhale carcinogenic containing smoke into the respiratory tract;

g. Continue to use design features such as flue curing to create a specific level of pH in smoke that allows smokers to inhale smoke more easily and readily;

h. Fraudulently, inappropriately or in other ways misusing and misapplying legal doctrines to oppose age, and other restrictions on smoking proposed by public health authorities;

i. Created shell and or sham corporations to disguise the true nature of the control and operations of Defendants;

j. Providing corporation witnesses representing or on behalf of Defendants in civil trials to propagate false and misleading testimony about the safety or reducing of risk of cigarettes and other tobacco products;

k. Propagating a nefarious strategy to transition underage smokers from one nicotine addictive product, (conventional cigarettes), to Electronic Nicotine Devices (ENDs)

knowing that underage smokers will become addicted and further without knowing the long-term health consequence of ENDs;

l.   Failing to comply with a federal court order that enjoins Defendants from making misstatements or suppressing information concerning cigarettes, including, but not limited to, any matter that: (a) involves health, safety, or other areas with which a reasonable consumer or potential consumer of cigarettes would be concerned; (b) a reasonable consumer or potential consumer would attach importance to in determining whether to purchase or smoke cigarettes; or (c) the Defendant making the representation knows or has reason to know that its recipient regards or is likely to regard as important in determining whether to purchase cigarettes or to smoke cigarettes, even if a reasonable person would not so regard it.

m.   Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

**Through June 2009**

n.   Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

o.   Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

p.   Continuing to market and/or advertise lights, ultra lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights", "mild", and "low" tar descriptors in 2010;

309.   Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this COMPLAINT continues through the present.

310.   The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

311.   The Plaintiff relied to his detriment upon the concealment and omission of such information.

312.   Each Defendants' acts and omissions, and those of the CTR, TIRC, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

313.   Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for

- 72 –

which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

314.    As a direct and proximate result of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff smoked and/or continued to smoke Defendants' cigarette products identified above in the Complaint which caused him to sustain injuries.

315.    As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

**COUNT V**
**CONSPIRACY TO COMMIT FRAUDLENT CONCEALMENT (Law Firms)**

Plaintiff incorporates by reference the allegations of paragraphs 1 through 315 of this COMPLAINT as though set forth in full in this cause of action.

316.    This count applies to the following Defendants ONLY: SHOOK, COVINGTON, GREENSPOON, and WOMBLE.

317.    The defendant law firms knew Philip Morris, RJ Reynolds, Liggett, and their co-conspirators were concealing the health effects and addictive nature of smoking cigarettes to the public, government officials, and health authorities, but nevertheless continued to provide them with substantial assistance and encouragement on carrying out the fraud.

318.    The defendant law firms' actions and participation in the furtherance of the conspiracy crossed their ethical and legal role and or responsibilities as attorneys and constituted unlawful and tortious conduct.

319.    The defendant law firms breached their ethical obligations as attorneys for defendants Philip Morris, RJ Reynolds, Liggett, and the other co-conspirator cigarette manufacturer clients, knowing that their tortious conduct was likely to cause injury and harm to third parties, including individuals in Hawai`i.

320.    The Defendant law firms' full participation in all aspects of the conspiracy was not legitimate legal representation of Defendants, Philip Morris, RJ Reynolds, Liggett, and other co-conspirator clients.

321.    The defendant law firms stopped being counsel and became co-conspirators.

322.    The defendant law firms provided substantial assistance to Philip Morris, RJ Reynolds, Liggett, and other tobacco manufacturers in that they oversaw, directed, actively participated, and managed the conspiracy in furtherance of the concealment of the health effects and addictive nature of smoking.

323.    The defendant law firms were instrumental in carrying out the conspiracy to conceal the health effects and addictive nature of smoking cigarettes, through various means of assisting Philip Morris, RJ Reynolds, Liggett, and their co-conspirators, including, but not limited to, the following:

   a. Controlling the research conducted by Philip Morris, RJ Reynolds, Liggett, and their co-conspirators and outside consultants in order to prevent any negative research from being published regarding cigarettes;

   b. Identifying what research that Philip Morris, RJ Reynolds, Liggett, and their co-conspirators would need to fabricate in order to counter emerging research that threatened the conspiracy;

   c. Establishing entire areas of research that were not be performed by Philip Morris, RJ Reynolds, Liggett, and their co-conspirators own internal researchers to avoid negative research against cigarettes;

   d. Misdirecting research to focus on other causes of smoking related diseases to deflect from cigarette smoking causation of disease;

   e. Directing Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to fund scientific research characterized as "not worth a damn" while also outright refusing to entertain proposals from credible groups with scientific positions contrary to that;

- 74 –

f.  Identifying and establishing relationships with "friendly" scientific witnesses, subsidizing their research with grants from tobacco funded vehicles, and hiding the relationship between those witnesses and the industry;

g.  Directing Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to pay scientists that had previously received industry funding, in order to prevent them from going public with negative findings;

h.  Devising and carrying out document destruction to protect the conspiracy;

i.  Designing and controlling organizations to hide negative industry documents behind the guise of work product privilege;

j.  Coaching Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to respond to public inquiries without exposing previous misrepresentations or omissions; and/or

k.  Attacking credible scientific evidence with the research the law firms directed Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to engineer.

324.    The defendant law firms concealed the harms and addictive nature of smoking in concert with, and at the direction of, Philip Morris, RJ Reynolds, Liggett and their co-conspirators. The defendant law firms' ultimate goal was to enable Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to maximize the sale of cigarette products throughout the United States, including cigarette products sold in Hawai`i to consumers, such as Marvin Manious.

325.    The defendant law firms' concerted efforts to conceal the harms and addictive nature of smoking cigarettes was fraudulent and resulted in harm to Marvin Manious.

326.    The defendant law firms were not simply providing traditional attorney-client assistance, but were acting outside the scope of the attorney-client relationship in assisting, guiding, and directing the fraud alongside and on behalf of Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to conceal the harms and addictive nature of smoking cigarettes.

327.    The defendant law firms knew and intended that their fraudulent conduct, occurring in and outside of the State of Hawai`i, and that of Philip Morris, RJ Reynolds, Liggett and their co-conspirators, would be purposefully directed throughout the United States, including to the State of Hawai`i, and would have a substantial effect on consumers located in Hawai`i, including Marvin Manious.

328.   As a direct and foreseeable result of the law firms' fraudulent conduct in assisting Philip Morris, RJ Reynolds, Liggett and their co-conspirators conceal the health effects and addictive nature of cigarettes, consumers in Hawai`i, including Marvin Manious, were not aware of the true harms and addictive nature of cigarettes. Nor were such consumers aware that so-called "filter", "light" and "low tar" cigarettes were not any safer than regular cigarettes. Marvin Manious, and other similarly situated Hawai`i consumers, justifiably relied on Philip Morris, RJ Reynolds, Liggett and their co-conspirators, as well as their agents, such as the law firms herein, as alleged in Counts III and IV above.

329.   As a direct and proximate result of the aforementioned concealment of material information by the law firms on behalf of Philip Morris, RJ Reynolds, Liggett, and their co-conspirators, Marvin Manious, smoked and/or continued to smoke cigarette products which caused him to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer irreparable and permanent harm and damages, in an amount to be proven at trial.

### COUNT VI
### FRAUDULENT MISREPRESENTATION (Reynolds)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 329 of this COMPLAINT as though set forth in full in this cause of action.

330.   This count applies to the following Defendant ONLY: REYNOLDS.

331.   Beginning at an exact time unknown to the Plaintiff and continuing even today, the cigarette manufacturers, including Defendant herein, have carried out, and continue to carry out a campaign designed to deceive the public, the Plaintiff the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts.

332.   The cigarette manufacturers, including Defendant herein, made literally hundreds of misrepresentations to the Plaintiff and others similarly situated over the course of the last 50 years. Plaintiff is unable to allege in full the thousands of pre-1969 advertisements, and the

continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because he does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendant herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

333. The cigarette manufacturers, including Defendant herein, carried out their campaign of fraud, false statements and/or misrepresentations in the following ways:

a. they agreed falsely to represent to the Plaintiff and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

b. they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

c. the cigarette manufacturers, including Defendant herein, used lawyers, scientists, and public relations firms to misdirect what purported to be objective scientific research, yet maintained to the Plaintiff and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

d. to discourage meritorious litigation by Plaintiff injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence in order to protect the cigarette manufacturers, including Defendant herein, existence and profits;

e. the cigarette manufacturers, including Defendants herein, designed, marketed, and sold "filtered" and "light" cigarettes despite knowing internally that such cigarettes were just as addictive, dangerous, and deadly as "regular" cigarettes;

- 77 –

f.  by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers.  Defendant knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendant marketed its "Light" cigarettes to consumers as a safer alternative. Defendant manipulated the design of cigarettes to produce test results that were artificially low. Furthermore, Defendant knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes;

g.  by continuing to fraudulently market and sell "mild", "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer.  The cigarette manufacturers, including Defendant herein, was ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including Defendant herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors.  These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes.  Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands.  The cigarette manufacturers, including Defendant herein, is thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild" cigarette marketing the ban was designed to prevent; and/or

h.  by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, Defendant and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

334.  Cigarette manufacturers knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers, including Defendant herein, to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

335.  Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not

- 78 –

for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox.

336.    Despite Defendant's and the industry's promises "to help scientists determine the facts about tobacco use and health" (see ¶ 49) and claiming to support research concerning tobacco and health, Defendants and the industry did not conduct the research they represented that they would conduct.

337.    Instead of conducting the research it promised to do, Defendant focused efforts on attacking health-related research that showed the dangers of smoking in order to keep alive a public controversy over whether tobacco smoke was harmful.

338.    The industry paid for advertisements in major newspapers to attack legitimate research.  For example, in 1969 the American Tobacco Company, a successor to R.J. Reynolds Tobacco Company stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

339.    Defendant continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

340.    The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

- 79 –

341. Instead of focusing their efforts on health issues as they represented, Defendant and the industry focused on research into modifying their cigarettes in order to increase their addictiveness.

342. Rather than making their research public as they had represented, Defendant and the industry publicly denied and suppressed the results of their research.

343. Defendant and the industry continued to engage in a course of conduct where they represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

344. Throughout the years, Defendant and its co-conspirators have continued to state that cigarettes were not dangerous, and they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

a. A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

b. In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

c. In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

d. Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

e. In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

f. A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer…cigarettes have never been proven unsafe."

- 80 –

g. In 1984, Ed Horrigan, Chairman of R.J. Reynolds spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

h. In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

i. In 1994, the CEOs of the tobacco industry gave congressional testimony where they stated it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

345. Defendant and the industry continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quitting.

346. Defendant and the industry promoted their message through a large number of press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendant and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

347. Industry spokespersons appeared on news shows, on commercials and public television to state that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease and that cigarette smoking was not addictive.

348. Defendant, when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

349. Defendant claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and plaintiff's claims.

350.    Defendant when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

351.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendant herein, and their co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

352.    The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendant herein, and their co-conspirators for the purposes of inducing the Plaintiff and others similarly situated to rely on such false statements and/or misrepresentations so as to induce persons such as the Plaintiff to smoke, fail to quit or fail to reduce consumption.

353.    During differing time periods of the Plaintiff's smoking, Plaintiff heard, read and saw statements and advertisements by the Defendant, and or their agents and representatives, including, but not limited to: smoking had not been proven to be harmful or addictive; and that light, low tar and filter cigarettes were less harmful.  The Plaintiff believed the statements, began and continued to smoke, and/or made decisions regarding the cigarette brands he smoked based on those statements and advertisements.

354.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators were justifiably relied upon by the Plaintiff and resulted in the Plaintiff being unaware of the extent of the danger of Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as regular and/or unfiltered cigarettes. Such acts, false statements and/or misrepresentations were made by Defendants who had knowledge superior to the Plaintiff regarding the health aspects of cigarettes including their addictive nature.

- 82 –

355.    As a direct and proximate result of the aforementioned fraudulent misrepresentations by the cigarette manufacturers, including Defendants herein, Plaintiff smoked and/or continued to smoke Defendants' cigarette products identified above in the Complaint which caused him to sustain injuries.

356.    As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

**COUNT VII**
**CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION**
**(Manufacturers)**

Plaintiff incorporates by reference the allegations of paragraphs 1 through 356 of this COMPLAINT as though set forth in full in this cause of action.

357.    This count applies to the following Defendants ONLY: PHILIP MORRIS, REYNOLDS, and LIGGETT.

358.    Defendants, along with other cigarette manufacturers, and the Council for Tobacco Research (CTR), The Tobacco Industry Research Committee (TIRC) and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public throughout the United States including in Hawai`i would rely on this information to their detriment. Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

359.    The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraph was material information.

360.    Plaintiff relied to his detriment upon the acts, false statements and/or fraudulent misrepresentations of such information.

- 83 –

361.    Each Defendant's acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

362.    Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

363.    During the time that the Plaintiff was smoking, he was exposed to, and aware of, numerous statements made by Defendants, and their co-conspirators including, but not limited to: claiming that cigarette smoking had not been proven to be harmful or addictive; and that light, low tar and filter cigarettes were less harmful.  As a result of that exposure the Plaintiff believed, to the detriment of his health, that cigarette smoking was safe.  The Plaintiff believed the statements, began and continued to smoke, and/or made decisions regarding the cigarette brands they smoked based on those statements.

364.    As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff smoked and/or continued to smoke Defendants' cigarette products identified above in the Complaint which caused him to sustain injuries.

365.    As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

<u>**COUNT VIII**</u>
<u>**CONSPIRACY TO COMMIT FRADULENT MISREPRESENTATIONS (Law Firms)**</u>

Plaintiff incorporates by reference the allegations of paragraphs 1 through 365 of this COMPLAINT as though set forth in full in this cause of action.

366. This count applies to the following Defendants ONLY: SHOOK, COVINGTON, GREENSPOON, and WOMBLE.

367. The defendant law firms knew Philip Morris, RJ Reynolds, Liggett, and their co-conspirators were misrepresenting the health effects and addictive nature of smoking cigarettes to the public, government officials, and health authorities, but nevertheless continued to provide them with substantial assistance and encouragement on carrying out the fraud.

368. The Defendant law firms' full participation in all aspects of the conspiracy was not legitimate legal representation of Defendants Philip Morris, RJ Reynolds, Liggett, and the other co-conspirator cigarette manufacturer clients.

369. The defendant law firms breached their ethical obligations as attorneys for defendants Philip Morris, RJ Reynolds, Liggett, and the other co-conspirator cigarette manufacturer clients, knowing that their tortious conduct was likely to cause injury and harm to third parties, including individuals in Hawai`i.

370. The defendant law firms, while holding themselves out as law firms were not providing legitimate legal representation to defendants Philip Morris, RJ Reynolds, Liggett, and the other co-conspirator cigarette manufacturer clients, but instead participated fully and in all aspects of the conspiracy.

371. The defendant law firms stopped being counsel and became co-conspirators.

372. The defendant law firms provided substantial assistance to Philip Morris, RJ Reynolds, Liggett, and other tobacco manufacturers in that they oversaw, directed, actively participated, and managed the conspiracy in furtherance of the misrepresentation of the health effects and addictive nature of smoking.

373.    The defendant law firms were instrumental in carrying out the conspiracy to misrepresent the health effects and addictive nature of smoking cigarettes, through various means of assisting Philip Morris, RJ Reynolds, Liggett, and their co-conspirators, including, but not limited to, the following:

a.  Controlling the research conducted by Philip Morris, RJ Reynolds, Liggett, and their co-conspirators and outside consultants in order to prevent any negative research from being published regarding cigarettes;

b.  Identifying what research that Philip Morris, RJ Reynolds, Liggett, and their co-conspirators would need to fabricate in order to counter emerging research that threatened the conspiracy;

c.  Establishing entire areas of research that were not be performed by Philip Morris, RJ Reynolds, Liggett, and their co-conspirators own internal researchers to avoid negative research against cigarettes;

d.  Misdirecting research to focus on other causes of smoking related diseases to deflect from cigarette smoking causation of disease;

e.  Directing Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to fund scientific research characterized as "not worth a damn" while also outright refusing to entertain proposals from credible groups with scientific positions contrary to that;

f.  Identifying and establishing relationships with "friendly" scientific witnesses, subsidizing their research with grants from tobacco funded vehicles, and hiding the relationship between those witnesses and the industry;

g.  Directing Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to pay scientists that had previously received industry funding, in order to prevent them from going public with negative findings;

h.  Devising and carrying out document destruction to protect the conspiracy;

i.  Designing and controlling organizations to hide negative industry documents behind the guise of work product privilege;

j.  Coaching Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to respond to public inquiries without exposing misrepresentations or omissions;

k.  Making their own misrepresentations to the public about the scientific evidence on smoking and health; and/or,

- 86 –

l.   Attacking credible scientific evidence with the research the law firms directed Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to engineer.

374.   The defendant law firms misrepresented the harms and addictive nature of smoking in concert with, and at the direction of, Philip Morris, RJ Reynolds, Liggett and their co-conspirators. The defendant law firms' ultimate goal was to enable Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to maximize the sale of cigarette products throughout the United States, including cigarette products sold in Hawai`i to consumers, including Marvin Manious.

375.   The defendant law firms' concerted efforts to misrepresent the harms and addictive nature of smoking cigarettes was fraudulent and resulted in harm to Marvin Manious.

376.   The defendant law firms were not simply providing traditional attorney-client assistance, but were acting outside the scope of the attorney-client relationship in assisting, guiding, and directing the fraud alongside and on behalf of Philip Morris, RJ Reynolds, Liggett, and their co-conspirators to misrepresent the harms and addictive nature of smoking cigarettes.

377.   The Defendant law firms knew and intended that their fraudulent conduct, occurring in and outside of the State of Hawai`i, and that of Philip Morris, RJ Reynolds, Liggett and their co-conspirators, would be purposefully directed throughout the United States, including to the State of Hawai`i, and would have a substantial effect on consumers located in Hawai`i, including Marvin Manious.

378.   As a direct and foreseeable result of the law firms' fraudulent conduct in assisting Philip Morris, RJ Reynolds, Liggett and their co-conspirators misrepresent the health effects and addictive nature of cigarettes, consumers in Hawai`i, including Marvin Manious, were not aware of the true harms and addictive nature of cigarettes. Nor were such consumers aware that so-called "filter", "light" and "low tar" cigarettes were not any safer than regular cigarettes. Marvin Manious, and other similarly situated Hawai`i consumers, justifiably relied on Philip Morris, RJ Reynolds, Liggett and their co-conspirators, as well as their agents, such as the law firms herein, as alleged in Counts VI and VII above.

379.    As a direct and proximate result of the aforementioned misrepresentations of material information by the law firms on behalf of Philip Morris, RJ Reynolds, Liggett, and their co-conspirators, Marvin Manious, smoked and/or continued to smoke cigarette products which caused him to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer irreparable and permanent harm and damages, in an amount to be proven at trial.

<u>COUNT IX</u>
<u>RETAILERS - STRICT LIABILITY</u>

Plaintiff incorporates by reference the allegations of paragraphs 1 through 379 of this Complaint as though set forth in full in this cause of action.

380.    This count applies to the following Defendants ONLY: FOODLAND, J. HARA, KEAAU, and WALMART.

381.    The cigarettes herein referenced in the Complaint were sold by Defendants, and purchased by the Plaintiff were defectively designed, manufactured, and marketed for all of the reasons set forth above.

382.    The Defendants owed a duty to the Plaintiff and the general public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous, and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

383.    The Defendants, breached said duty by placing cigarette products identified above in the Complaint into the stream of commerce which were unreasonably dangerous and hazardous to the public, including the Plaintiff, for the following reasons:

a) The products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

b) The products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant;

c) The risk of danger of the product outweighed the benefits.

- 88 –

384.    It was reasonably foreseeable, and Defendants, were fully aware, that consumers such as Plaintiff  were buying cigarettes at their retail locations to be smoked.

385.    Defendants are strictly liable by operation of Hawai`i law for the defective and unreasonably dangerous cigarettes it sold to Plaintiff.

386.    As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable and permanent harm and damages, in an amount to be proven at trial.

## COUNT X
## BREACH OF IMPLIED WARRANTY (Manufacturers)

Plaintiff incorporates by reference the allegations of paragraphs 1 through 386 of this Complaint as though set forth in full in this cause of action.

387.    This count applies to the following Defendants ONLY: REYNOLDS.

388.    At all times, Defendant impliedly warranted that cigarettes smoked by the Plaintiff was fit for use by consumers and users, including Plaintiff for its intended use, that it was of merchantable quality, and that it was adequately tested and fit for its intended purpose.

389.    At the time of making these warranties, Defendant knew or should have known that, in fact, the representations and warranties were false, misleading, and untrue in that cigarettes smoked by the Plaintiff was not safe and or safer, effective and fit for use by consumers and users, including Plaintiff for its intended use, that it was not of merchantable quality, and other injuries as herein alleged, and that it was not adequately tested or fit for its intended purpose.

390.    Members of the public, including Plaintiff, reasonably relied upon the skill and judgment of Defendant and upon said implied warranties in using Defendant's cigarettes.

391.    Plaintiff used the cigarettes identified above in the Complaint for its intended purpose.

392.    Defendant breached said implied warranties, in that, cigarettes smoked by the Plaintiff were not safe and or safer, and fit for its intended purpose, was not of merchantable quality, and, in fact, caused deaths and or serious and potentially lethal disease to consumers and other injuries as herein alleged.

- 89 –

393.    As a direct and proximate result of Defendant's breach of implied warranties and the unreasonably dangerous and defective characteristics of the cigarettes smoked by the Plaintiff the Plaintiff suffered injuries as set forth herein.

## COUNT XI
## LOSS OF CONSORTIUM

Plaintiffs allege and reincorporate by reference the paragraphs 1-393 above as if the same were set forth in their entirety and further alleges as follows:

385.    This count applies to all Defendants.

386.    Defendants' conduct, as described herein, proximately caused the injuries to the Plaintiffs identified above in paragraphs of this the Complaint.

386.    At all relevant times herein, and as identified in the paragraphs above, the Spouse depended on the Plaintiff for physical, moral, and/or social necessities.

387.    As a direct and proximate result of Defendants' conduct, the Spouse is entitled to damages for loss of society, companionship, comfort, consortium, attention, advice, services, necessities, or counsel; and other damages recoverable at law, including damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally, wherever possible, as to all counts herein;

B.      Special damages in an amount to be proven at trial;

C.      General damages in an amount to be proven at trial;

D.      Pre-judgment interest;

E.      Post judgment interest;

F.      Punitive damages sufficient to punish Defendants for their extreme and outrageous conduct and deter such conduct in the future;

G.      Costs of suit;

H.      Such other and further relief as the Court deems necessary, just, and proper.

DATED:  Honolulu, Hawai`i, March 15, 2022.


                                    _/s/ Wayne Parsons_____
                                    WAYNE PARSONS
                                    SERGIO RUFO
                                    ALEJANDRO ALVAREZ
                                    Attorneys for Plaintiffs

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAI‘I

| | |
|---|---|
| MARVIN MANIOUS, and his spouse, VALERIE MANIOUS,<br><br>        Plaintiffs,<br>    vs.<br><br>R.J. REYNOLDS TOBACCO COMPANY, a North Carolina for-profit corporation; PHILIP MORRIS USA, INC., a Virginia for-profit corporation; LIGGETT GROUP LLC, a Delaware for-profit limited liability corporation; SHOOK, HARDY & BACON L.L.P., a foreign limited liability partnership; COVINGTON & BURLING L.L.P., a foreign limited liability partnership; GREENSPOON MARDER L.L.P., a foreign limited liability partnership; WOMBLE BOND DICKINSON (US) L.L.P., a foreign limited liability partnership; FOODLAND Super Market, Limited d/b/a FOODLAND, SACK ‘N SAVE FOODS, and GAS N GO, a Hawai‘i domestic corporation; J. HARA STORE, INC., Limited, a Hawai‘i domestic corporation; and WAL-MART INC.,<br><br>        Defendants. | Civil No. _____<br>Kona<br>(Product Liability)<br><br>DEMAND FOR JURY TRIAL<br><br><br><br><br><br><br><br><br><br><br><br><br>Judge:<br><br>Trial:  No trial date assigned. |

**DEMAND FOR JURY TRIAL**

      Plaintiffs, MARVIN MANIOUS, and his spouse, VALERIE MANIOUS, by and through their attorneys, Wayne Parsons, Sergio Rufo and Alejandro Alvarez hereby demands trial by jury on all issues triable in the above-entitled action.

      DATED:  Honolulu, Hawai‘i, March 15, 2022.

                               */s/ Wayne Parsons*
                                 WAYNE PARSONS
                                 SERGIO RUFO
                                 ALEJANDRO ALVAREZ
                                 Attorneys for Plaintiffs

| STATE OF HAWAI'I CIRCUIT COURT OF THE THIRD CIRCUIT | SUMMONS TO ANSWER COMPLAINT |
|---|---|

**CASE NUMBER**

**PLAINTIFF'S NAME & ADDRESS, TEL. NO.**

CHRISTINE ROACH

| C/O Wayne Parsons | Sergio Rufo | Alejandro Alvarez |
|---|---|---|
| 1406 Colburn Street, Ste. 201C | 1050 Bishop Street # 322 | 3251 Ponce de Leon Blvd |
| Honolulu, HI 96817 | Honolulu, HI 96813 | Coral Gables, FL 33134 |
| Ph: 808-845-2211 | Ph: 808-852-7836 | Ph: (305) 444-7675 |

| PLAINTIFF                              VS.<br>MARVIN MANIOUS, and his spouse, VALERIE MANIOUS | DEFENDANT(S)<br>R.J. REYNOLDS TOBACCO COMPANY, a North Carolina for-profit corporation; PHILIP MORRIS USA, INC., a Virginia for-profit corporation; LIGGETT GROUP LLC, a Delaware for-profit limited liability corporation; SHOOK, HARDY & BACON L.L.P., a foreign limited liability partnership; COVINGTON & BURLING L.L.P., a foreign limited liability partnership; GREENSPOON MARDER L.L.P., a foreign limited liability partnership; WOMBLE BOND DICKINSON (US) L.L.P., a foreign limited liability partnership; FOODLAND Super Market, Limited d/b/a FOODLAND, SACK 'N SAVE FOODS, and GAS N GO, a Hawai`i domestic corporation; J. HARA STORE, INC., Limited, a Hawai`i domestic corporation; and WAL-MART INC., |
|---|---|

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

Wayne Parsons, Esq., Sergio Rufo, Esq. and Alejandro Alvarez, Esq.

_____ ,

plaintiff's attorney, whose address is stated above, an answer to the  Complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED | CLERK | CIRCUIT COURT CLERK |
|---|---|---|
|  |  |  |

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us



In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402; MAUI- Phone No. 808-244-2929, FAX 808-244-2777; HAWAII- Phone No. 808-961-7424, TTY 808-961-7422, FAX 808-961-7411; KAUAI- Phone No. 808-482-2365, TTY 808-482-2533, FAX 808-482-2509, at least ten (10) working days prior to your hearing or appointment date.

Form 1C-P-787 (10/19)
Summons to Complaint  RG-AC-508 (10/19)